```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT  OF TEXAS
 2                     AMARILLO DIVISION

 3   JOWELL C. BULLARD, NORRIS      §
     RAY TOLLERSON, JR., RANDY      §
 4   STOKES, JR., DONNA DAVIS,      §
     ROBERT F. DEXTER, JR.,         §
 5   JOSHUA R. LUSTER, SCOTT        §
     RUSK, JEFFORY E. POOL, TYE     §
 6   A. WARD, JAMES DAVID SMITH,    §
     MICHAEL A. KING, DOMINGO       §
 7   MARQUEZ, STEPHEN A. WILSON,    §
     H. WAYNE BLACK, CHARLES        §
 8   DOUGLAS WALKER, GARY D.        §
     PHENIX, SCOTT BEECHER          §
 9   HERRING, PAM J. HITT, SAMUEL   §    CASE NO. 2:07-CV-049-J
     RAY GIBSON, EUFEMIO JOE        §
10   RUBALCABA, CHRISTOPHER L.      §
     SCHWARZ, STACY L. GRANT,       §
11   HERBERT CHARLES CARR, CHRIS    §
     JENKINS, TODD FINLEY, KEVIN    §
12   WAYNE OSBORNE, M.L.            §
     WITHERSPOON, ALVIN VIRGIL      §
13   NEWTON, RODERICK J. UPTON,     §
     KEVIN LANKFORD, on their       §
14   own behalf and for all         §
     others similarly situated,     §
15                                  §
          Plaintiffs,               §
16                                  §
     VS.                            §
17                                  §
     BABCOCK & WILCOX TECHNICAL     §
18   SERVICES PANTEX, L.L.C.,       §
                                    §
19        Defendant.                §

20   ============================================================

21      REQUESTED EXCERPT OF TRIAL TESTIMONY OF JOWELL BULLARD

22
                        AUGUST 20, 2008
23

24                      VOLUME I OF I

25   ============================================================
```

1          On the 20th day of August, 2008, a Bench Trial in the

2    above-entitled and numbered cause came on to be heard before

3    the Honorable Mary Lou Robinson, United States District Judge

4    for the Northern District of Texas, presiding, and the

5    following requested excerpt was had:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings reported by mechanical stenography; transcript
     produced by computer.
25

```
 1                        A-P-P-E-A-R-A-N-C-E-S

 2

 3   FOR THE PLAINTIFFS:              MR. MICHAEL A. WARNER
                                      The Warner Law Firm
 4                                    Attorneys at Law
                                      101 SE 11th, Suite 301
 5                                    Amarillo, TX  79101

 6
                                      AND
 7

 8                                    MR. JASON C. WEBSTER
                                      Matthews & Associates
 9                                    Attorneys at Law
                                      2905 Sackett
10                                    Houston, TX  77098

11

12

13

14   FOR THE DEFENDANTS:             MR. BRADLEY W. HOWARD and
                                     MR. ROBERT C. VARTABEDIAN
15                                   Brown & Fortunato
                                     Attorneys at Law
16                                   PO Box 9418
                                     905 S Fillmore, Suite 400
17                                   Amarillo, TX  79105-9418

18

19

20   COURT REPORTER:                 MS. STACY MAYES MORRISON
                                     Official Court Reporter
21                                   205 E. 5th, LB #F13263
                                     Amarillo, Texas  79110
22                                   (806) 372-1175

23

24

25
```

<u>PROCEEDINGS FOR AUGUST 20, 2008</u>

1

2      (The following requested excerpt took place in open

3  court with all parties present.)

4            THE COURT:  Call your next witness.

5            MR. WEBSTER:  The Plaintiff calls Jowell Bullard.

6      (Pause.)

7            THE COURT:  Raise your hand and be sworn.

8      (The witness was sworn by the Court.)

9            THE COURT:  Would you take the stand, please.

10                  JOWELL BULLARD,

11      having been first duly sworn, testified as follows:

12                  <u>DIRECT EXAMINATION</u>

13  BY MR. WEBSTER:

14  Q.   Would you please state your name for the record, sir.

15  A.   Jowell Bullard.

16  Q.   Mr. Bullard, could you please tell the Court what your

17  current job position is.

18  A.   I'm an Amarillo police officer.

19  Q.   And prior to being an Amarillo police officer, what did

20  you do, sir?

21  A.   I worked at Pantex.

22  Q.   How long did you work for Pantex?

23  A.   Five years and approximately eight months.

24  Q.   Mr. Bullard, during that time at Pantex, what was your

25  job duty, sir?  Can you give us a history of what all you

1  did.

2  A.    I began as a SPO II on Group 4, performed the general

3  duties as a SPO, as required.

4       I went through the training of a SPO III and then

5  performed the duties of a SPO III, as required.

6       And then was promoted as lieutenant.  I performed those

7  duties as well.

8  Q.    When were you promoted as a lieutenant, sir,

9  approximately?

10 A.    Honestly, I cannot remember off the top of my head.

11 Q.    How long were you a SPO -- how long were you a

12 lieutenant?

13 A.    I think a little less than two years.

14 Q.    Now, as a -- as a -- what type of a lieutenant were you,

15 sir?

16 A.    A field lieutenant.

17 Q.    And were you responsible for the supervision of SPO's?

18 A.    Yes.

19 Q.    And did your normal job duties include post checks and

20 those things of the nature that we've heard Mr. Carr and

21 those individuals talk about here in this trial?

22 A.    Yes.

23 Q.    Now, do you consider your job, sir, as a manual labor

24 job, working as a -- working as a field lieutenant at Pantex?

25 A.    There was quite a bit of manual labor involved, yes.

1   Q.    How much office work or nonmanual work would you say you

2   performed on a daily basis?

3   A.    Very little.  I couldn't tell you exactly.

4   Q.    Now, was there a time, sir, that you were asked to fill

5   out rec or non-recommendation forms?

6   A.    Yes, sir, I was.

7   Q.    And when you were asked to fill out those rec or

8   non-recommendation forms, do you believe they were given any

9   particular weight as to the promotion of any of the

10  individuals that you did?

11  A.    No, I do not.

12  Q.    And why do you feel that way, sir?

13  A.    The individual -- I believe there's only one individual

14  that was promoted that I had actually recommended, and when I

15  spoke with the shift commander, I asked him, "Was he promoted

16  from the fact that I provided the information on him?"  He

17  said, "Everybody just has to do -- every lieutenant has to

18  fill one of those out."

19  Q.    Okay.  So who was the shift commander you talked with?

20  A.    That was Shift Commander Steve Reynolds.

21  Q.    And when you talked with Mr. Reynolds, you didn't get

22  the feeling that your recommendation or non-recommendation

23  forms made any difference?

24  A.    That's correct.

25  Q.    All right.  Now, at some point in time, sir, prior to

1   this lawsuit being filed, did you speak with any individuals

2   about -- about your belief that you were entitled to time and

3   a half while working at Pantex?

4   A.    Yes, I did.

5   Q.    And who did you talk to about that?

6   A.    Numerous, numerous individuals.

7   Q.    Okay.  Name some.  I would like to know who at Pantex

8   management, Mr. Bullard, that you spoke with with regards to

9   the fact that you believed that you were nonexempt under the

10  FLSA and entitled to time and a half.

11  A.    I spoke with, right off the top of my head, Steve

12  Reynolds, Robert Roderick, Jeff Oldham, many of the

13  lieutenants that I was assigned to the shift with, several

14  lieutenants that accompanied me to Nevada during my firearms

15  instructor course, and then several of the lieutenants that

16  were assigned in Nevada at the Nevada Test Site.

17  Q.    And was that during -- was that while they were working

18  for Pantex out at the plant?

19  A.    The individuals that accompanied me?

20  Q.    Yes.

21  A.    Yes.

22  Q.    And who were those individuals again?  Do you recall

23  their names?

24  A.    Israel Vega.  I can see their faces; I can't remember

25  all of their names.  Their names are recorded, I'm sure, by

1    Pantex, the ones that accompanied me.

2    Q.    What did you talk to Israel Vega about?

3    A.    The fact that we actually rated time and a half when

4    work -- working overtime past forty hours per week.

5    Q.    When you say "we," who are you talking about?

6    A.    The lieutenants and supervision that worked in the

7    field.

8    Q.    And when you spoke with Steve Reynolds and asked him

9    about the -- first of all, what's Steve Reynolds' position?

10   He hadn't been a -- he hadn't been a witness in this trial.

11   A.    Steve Reynolds is a -- or at this time that I'm

12   referring to, is a shift commander.

13   Q.    Okay.  This -- and then what did you ask Mr. Reynolds

14   with respect to overtime?  Can you tell us the conversation

15   you had with him.

16   A.    Not quoting, but pretty -- pretty close was, I referred

17   to the Fair Labor Standards Act and the requirements needed

18   to fulfill the necessity for the actual exempt position and

19   then the lieutenants didn't fit that requirement.

20   Q.    Did Mr. Reynolds agree with you?

21   A.    He did not.

22   Q.    What did he say?

23   A.    He advised me to keep my opinions to myself and referred

24   to some incident that happened prior to my employment with

25   Pantex pertaining to another individual, who is actually a

1   Plaintiff on this lawsuit, Bob Dexter.

2   Q.   Okay.  And what did he say with regards to Mr. Dexter,

3   if you recall, or what -- what inference -- what was he

4   inferencing (sic) with respect to that?

5   A.   Just quoting what he said, "He was blackballed," end

6   quote.

7   Q.   Okay.  And that was -- that was the impression you got

8   would happen to you if you continued to complain about the

9   Fair Labor Standards Act?

10  A.   Yes.  That's what he was referring to.

11  Q.   Now, who is Robert Roderick?

12  A.   At the time I was speaking with him, he was a shift

13  commander as well for Group 2, I think.

14  Q.   Okay.  And Mr. -- he was a shift commander also?

15  A.   Yes, sir.

16  Q.   And, as a shift commander, what types of conversations

17  did you have with Robert Roderick regarding -- regarding the

18  Fair Labor Standards Act and your belief as being nonexempt?

19  A.   It was limited with him.  It was generally the same.  I

20  asked him what he thought, if we were actually exempt or they

21  just paying us that way to save themself money.  And he said,

22  "That kind of conver -- you know, that kind of topic will get

23  a person in trouble," you know, something along those lines.

24  Q.   Okay.  And that's basically what happened with him?

25  A.   With Roderick --

1   Q.    Is that --

2   A.    -- yes.

3   Q.    Is that the only conversation you recall having with

4   him --

5   A.    Yes.

6   Q.    -- about that?

7   A.    Yes, sir.

8   Q.    Okay.  Now, you said Jeff Oldham; is that correct?

9   A.    He was in -- he was in the office at the same time.

10  Q.    Okay.  And -- oh, he was there during this same

11  conversation?

12  A.    We were just sitting around talking.

13  Q.    Did Mr. Oldham have anything to say about the Fair Labor

14  Standards Act and your belief that you were exempt under the

15  rules?

16  A.    No, sir, he didn't.

17  Q.    Okay.  Now, did you ever have any conversations with Mr.

18  Voyles about the Fair Labor Standards Act?

19  A.    It was in March.  It was actually prior to the actual

20  filing of the lawsuit when I was referring to -- I'd spoken

21  with Mr. Warner about the --

22  Q.    We don't want to hear conversations -- don't speak about

23  conversations with your lawyer.

24        What I asked you, specifically asked you is if you had

25  any conversations with Mr. Voyles regarding the Fair Labor

1  Standards Act?

2  A.    Okay.   Okay.   Then what I'm leading up to is, he  —— Mr.

3  Voyles —— suspended myself and three others.

4          MR. HOWARD:   Objection, Your Honor, relevance.

5  This is the retaliation claim, which has been dismissed.

6          THE COURT:   Sustained.

7  Q.    (By Mr. Webster)   Did Mr. Voyles ever tell you that he

8  did not believe you -- that he believed you were exempt under

9  the Fair Labor Standards Act?

10 A.    What I have to refer to is what was just objected to, so

11 I don't -- can I answer that?

12 Q.    No.   I just want -- I just want to know if --

13 A.    Yes.   Yes, he did --

14 Q.    Okay.

15 A.    -- at that time.

16 Q.    And is it your belief here that Mr. Voyles believed that

17 you were not entitled to overtime at time and a half?

18 A.    Yes.

19 Q.    Do you believe, as you sit here today, Mr. Bullard, that

20 you have any independent discretion or independent judgment

21 or discretion with respect to your job duties at Pantex?

22          MR. HOWARD:   Objection, Your Honor, relevance.

23 We're not claiming that Mr. Bullard is an administrative

24 exempt.   We're only claiming exempt executive duties for Mr.

25 Bullard.

Jowell Bullard (Cross--Defendant)

1          MR. WEBSTER:  No problem, Your Honor.  I'll

2    withdraw the question, Mr. Bullard.  I will pass the witness.

3          MR. HOWARD:  May I approach the witness, Your

4    Honor?

5          THE COURT:  Yes.  What exhibits did you give the

6    witness?

7          MR. HOWARD:  I apologize, Your Honor.  6, 7, 8 and

8    10.

9        (Pause.)

10          THE WITNESS:  You also have Exhibit 9 up here.

11          MR. HOWARD:  Oh, thank you, sir.  And Exhibit 9,

12    Your Honor.

13          THE COURT:  You may proceed.

14          MR. HOWARD:   Thank you.

15                    <u>CROSS EXAMINATION</u>

16    BY MR. HOWARD:

17    Q.    Good morning, Mr. Bullard.

18    A.    Good morning.

19    Q.    These discussions that you were recounting for the

20    Court, I'd like to discuss those for just a few minutes here.

21    The discussion you had with Terry Voyles, wasn't that right

22    before you filed this lawsuit?

23    A.    What's your definition of "right before"?

24    Q.    Let's say within days of your filing the lawsuit.

25    A.    You're speaking specifically about Terry Voyles, right?

1   Q.   Yes, sir.  I understood earlier today you said that at

2   that point you had engaged Mr. Warner and that you talked

3   with Mr. Voyles.

4        And wouldn't you agree, sir, that was right before you

5   filed this lawsuit?

6   A.   For Mr. Voyles only, yes.

7   Q.   With regard to Mr. Oldham, that's Jeff Oldham?  Is that

8   who you're referring to as one of the discussions that you

9   had about the Fair Labor Standards Act?

10  A.   Yeah, I identified him as Jeff Oldham.

11  Q.   And that was a co-worker of yours who eventually

12  promoted to lieutenant; isn't that correct?

13  A.   He was a lieutenant far longer than I was, so he was

14  promoted before I was, yes.

15  Q.   Not -- not too long before you; isn't that right?

16  A.   A few years.  So whatever "too long" means, yes.

17  Q.   So a co-worker of yours, a fellow lieutenant; is that

18  correct?

19  A.   When I worked with him, he was a major, so --

20  Q.   And then Steve Reynolds, you recounted a discussion with

21  Steve Reynolds.  And Steve Reynolds was a good friend of

22  yours; isn't that correct?

23  A.   What's the definition of "friend"?

24  Q.   Go to the lake together, go fishing together, hang out

25  together.

1    A.    Fishing and going to the lake together, no.

2    Q.    So it's your testimony that Steve Reynolds wasn't a good

3    friend of yours when you had these discussions with him?

4    A.    No, I'm saying I didn't go to the lake or go fishing

5    with him.

6    Q.    But he was a good friend of yours, right?

7    A.    I spoke with him, yes.

8    Q.    And Israel Vega, he was also a co-worker, a

9    co-lieutenant; isn't that correct?

10   A.    That's correct.

11   Q.    Before you filed this lawsuit, you never put the company

12   on notice in writing that you felt you were misclassified,

13   did you?

14   A.    In writing?

15   Q.    Yes, sir.

16   A.    No, I did not.

17   Q.    Do you have personal knowledge of why Bob Dexter was

18   removed from his SRT duties?

19   A.    Personal knowledge that was given to me by Bob Dexter,

20   yes.

21   Q.    So you have secondhand information about why Mr. Dexter

22   no longer had his SRT duties; isn't that correct?

23   A.    He was the source, so I would think that would be

24   firsthand.

25   Q.    And, in fact, Mr. Spaulding was the one who removed

1  those SRT duties from Mr. Dexter; isn't that correct?

2  A.    I have no idea about that.

3  Q.    And you would have no idea why Mr. Spaulding did that,

4  would you?

5  A.    No.

6  Q.    If I could refer you, Mr. Bullard, to Exhibit No. 9.

7  That's a recommendation that you prepared for Ryan Neusch;

8  isn't that correct?

9  A.    His name's pronounced Ryan Nash (phonetic), but yes.

10  Q.    Ryan Nash (phonetic).  And that was in April of '06;

11  isn't that correct?

12  A.    It appears to be so.

13  Q.    And Mr. Neusch promoted then, didn't he?

14  A.    He did get promoted, yes.

15  Q.    He promoted then, didn't he, that promotion board?

16  A.    Yes, that promotion board.

17  Q.    And, sir, wouldn't you agree that, when Steve Reynolds

18  was your shift commander, that he would tell you -- if a

19  lieutenant was going up for promotion, he would tell you,

20  "Jowell, fill out recommendation forms for these

21  lieutenants"?

22  A.    Yes, he did.

23  Q.    If I could refer you, Mr. Bullard, to Exhibit No. 10,

24  and if I could refer you to the resumé that you prepared

25  that's a little bit further into the package.  It says,

Jowell Bullard (Cross--Defendant)

1   "Jowell Clintyn Bullard" on top and has your home address,

2   when you were applying for the position with the Amarillo

3   Police Department.

4   A.    Okay.  I'm there.

5   Q.    And this is a document that you prepared; isn't that

6   correct?

7   A.    Yes, it looks like it is.

8   Q.    And you outlined your duties at BWXT Pan -- Pantex,

9   excuse me, from 2002 until the time you prepared this; isn't

10  that correct?

11  A.    2002 to present.

12  Q.    When did you prepare this resumé?

13  A.    I have no idea.

14  Q.    Not even roughly?

15  A.    I update them all the time, so I have no idea.

16  Q.    And did you truthfully outline some of your duties as a

17  field lieutenant in this exhibit?

18  A.    Must be looking at a different one than you're looking

19  at.  Which one are you looking at?

20         MR. HOWARD:   May I approach the witness, Your

21  Honor?

22  A.    Okay.  I get you.  I see it.

23  Q.    (By Mr. Howard)  Do you see where I am?

24  A.    Yeah.

25  Q.    Did you truthfully outline your duties there as an SRT

1    lieutenant under the employment part of your resumé?

2    A.    I believe I did.

3    Q.    Okay.  And so you participated in the HRP program as a

4    supervisor at Pantex; isn't that correct?

5    A.    Yes.

6    Q.    And you also maintained control and supervised your team

7    members' activities; isn't that correct?

8    A.    To an extent, yes.

9    Q.    Well, in your -- in your resumé, you said you maintained

10   control and you supervised your team members' activities.

11   A.    And I left it pretty vague as well, yes.

12   Q.    Is that -- is that the truth though?  Is that what you

13   did as a lieutenant?

14   A.    That's one of the things I've done, yes.

15   Q.    Did you also exercise supervisor duties over patrols?

16   A.    Yes, I did, on certain occasions.

17   Q.    And did you have supervision over events and overall

18   status of your team?

19   A.    Events?  Define events.

20   Q.    Well, it's in your resumé, sir.  I'm just asking you if

21   what you put here is true.

22   A.    It's pretty broad, but, yes, on certain things, I did.

23   Q.    So is there any issue to you that you were supervising

24   your team?  When you said it here in your resumé, was there

25   any doubt --

Jowell Bullard (Cross--Defendant)

1    A.    Was I supervising my team?  Yes, I supervised my team.

2    Q.    If I could refer you, Mr. Bullard, to Defendant's

3    Exhibit No. 7, in particular, the page on the bottom that

4    says 7456.  And that's one of your check sheets that you

5    prepared; isn't that correct?

6    A.    As required by the shift commander.

7    Q.    Yes, sir.  And it says "JB" up on top.  That's Jowell

8    Bullard, right?

9    A.    Uh-huh.  Required by the shift commander.

10   Q.    And on -- your shift commander required you to prepare

11   these officer check sheets; isn't that correct?

12   A.    That is correct.

13   Q.    And that was a part of your duties as a field

14   lieutenant?

15   A.    That is required by the shift commander.

16   Q.    And on the back of that page, there's an on-the-spot

17   correction.  That was something that you prepared; isn't that

18   true?

19   A.    As required by the shift commander, we always had to

20   have at least one on there.

21   Q.    I'm sorry, say --

22   A.    The shift commander I'm referring to is Steve Reynolds.

23   Q.    But I didn't understand what you said before that.

24   A.    As required by the shift commander --

25   Q.    The shift command --

Jowell Bullard (Cross--Defendant)

1    A.    -- we're required to perform one on-the-spot training.

2    Q.    Well, this is an on-the-spot correction, isn't it?

3    A.    Well, that's what I mean.  Correction, pardon, my

4    mistake.

5    Q.    And then so when you would do an on-the-spot correction

6    of somebody you were supervising, you were training them to

7    do the job the right way; is that correct?

8    A.    Not necessarily.  They already know to do it the right

9    way.  I'm just on the spot correcting them.

10   Q.    So you're telling them if they're doing it the wrong way

11   so that they can then do it the right way; is that correct?

12   A.    Just a -- just a refresher.

13   Q.    And then that's one of your duties as a field

14   lieutenant; isn't that correct?

15   A.    As required by the shift commander, yes, it is.

16   Q.    Yes, sir.  And if I could refer you to Defendant's

17   Exhibit No. 6, please.  You know what a PX-3015 is, don't

18   you, Mr. Bullard?

19   A.    Yes, I do.

20   Q.    That's an activity report that you would prepare on all

21   of your shifts?

22   A.    Yes, it is.

23   Q.    And would you agree that Defendant's Exhibit 6 is a

24   sampling -- it's not all of them because that would take a

25   box, but it's a sampling of some of the 3015's that you

Jowell Bullard (Cross--Defendant)

1   prepared as a field lieutenant?

2   A.    It appears to be one, yes.

3   Q.    And if I could refer you, sir, to PAN 3714.

4   A.    I'm there.

5   Q.    On the bottom, sir, that's an on-the-spot correction

6   that you made to Mr. Holder; isn't that correct?

7   A.    Yes, it is.

8   Q.    And then if I could refer you, sir, to PAN 3736, the

9   time 2030.   That was an on-the-spot correction that you

10  prepared for Mr. Johnson; isn't that correct?

11  A.    It appears to be so.

12  Q.    And if I could refer you, sir, to PAN 3737.

13  A.    Hold on.   Let's stay on 3736.   Also, you notice the

14  writing is -- the handwriting is different.   I didn't write

15  the rest of those, so somebody added things to that one.

16  Q.    That's fine.   I'm not concerned -- my only concern was

17  the entry at 2030, which is your handwriting, correct?

18  A.    That is -- that's my writing, yes.

19  Q.    And if I could refer you to 3737, that's also your

20  handwriting; isn't that correct?

21  A.    Yes.   What part of it do you want me to look at?

22  Q.    Nothing in particular.   I just wanted to -- well, let's

23  refer to 1850.   That's your handwriting, isn't it, the time

24  being 1850?

25  A.    1850?   Yes.

1    Q.    Then if I could refer you to 3778.  On that page, sir,

2    at 945, you're documenting an incident at 1226; isn't that

3    correct?

4    A.    It's cut off.  I don't see the times.  What do you -- I

5    mean, you say 37 -- 37 what, PAN 37 what?

6    Q.    3778.  You've outlined there, there was an incident at

7    945, and then you prepared a report over the incident at

8    12 o'clock -- 1200; isn't that correct?

9    A.    Yeah, I reported some incident, yes.

10   Q.    And then on Page 3875, at 930, you attended a Proud to

11   Lead meeting; isn't that correct?

12   A.    Yes.  It --

13   Q.    And that was just one of --

14   A.    -- looks like I did.

15   Q.    Just one of the supervisory meetings you had to attend;

16   isn't that correct?

17   A.    Yeah, we were required to attend that.

18   Q.    And then Defendant's Exhibit No. 8, sir, these are all

19   HRP certifications that you prepared; isn't that correct?

20   A.    Looks like it.

21             MR. HOWARD:  Pass the witness.  Thank you, sir.

22             THE WITNESS:  You're welcome.

23                    REDIRECT EXAMINATION

24   BY MR. WEBSTER:

25   Q.    Mr. Bullard, I have a few more questions for you based

1    on Mr. Howard's cross.

2         He talked about your resumé for a minute.  Do you recall

3    that?

4    A.    Yes, I -- yes, I do.

5    Q.    In order to promote at Pantex, what is your

6    understanding as to what your resumé has to look like in

7    order to -- in order for it to get picked up?

8    A.    It has to appear -- well, let me back up a second there.

9         There's a -- there's an objective set out that has a

10   certain amount of words in it.  If your resumé doesn't have

11   those certain words in your resumé, you don't look adequate

12   to fulfill that position.

13   Q.    Okay.  Let's back up for a second.  When you know --

14   when you're going to apply for a promotion like you've done

15   here --

16   A.    Uh-huh.

17   Q.    -- is there a job description that comes out?  Where do

18   you -- where do you find the promotion that you want to apply

19   for?

20   A.    Yes.  I see what you mean.  Yes.  Yes, it is.

21   Q.    Okay.  And that job description, explain that to the

22   Court, what that is.

23   A.    It's predetermined position -- or predetermined amount

24   of information set out by the company that what they're

25   looking for in a person for the particular position that

1    they're seeking to fill, and if you don't have those

2    requirements, you won't be a -- you're not eligible for that

3    position.

4    Q.    Now, with respect to that, is it -- are those resumés

5    actually scanned into a scanner and checked for those words?

6    A.    That's my belief, it is, yes.

7    Q.    Okay.   Who's told you that before?

8    A.    Many people.   Like Steve Reynolds for sure.   Many of my

9    other supervisors.   Anybody that has promoted prior to me or

10   in a position that I was seeking with, anybody like that.

11   Q.    Now, is that pretty much policy and procedure, as you

12   understand it, at Pantex that you must have the job

13   description key words in it in order to even be considered

14   for the position?

15   A.    Yes, sir.

16   Q.    And that would be whether you're qualified or not; is

17   that true?

18   A.    Yes, sir.

19   Q.    And do you know if there's people that try to promote to

20   different positions that they may not be qualified for?

21   A.    There is, yes, sir.

22   Q.    Has that happened in the security force?

23   A.    Yes, sir.

24   Q.    And so these things are scanned in by a computer, and

25   it's actually -- the words are actually checked against the

1    resumé to make sure that they meet the job description before

2    you'll ever even be considered for it; is that true?

3    A.    Yes, sir.

4         MR. HOWARD:   Objection, Your Honor.  He's leading

5    the witness.

6         THE COURT:   Sustained.

7    Q.    (By Mr. Webster)  Explain to us how the -- how your

8    resumé is picked up at Pantex for -- for a particular job, in

9    order to be interviewed or to apply for a particular position

10   at Pantex.

11   A.    You have to appear that you have certain past experience

12   or past education or training that they're wanting to fill in

13   that position for them to actually even look at it, if that

14   makes sense.

15   Q.    What is the process by which Pantex looks for the key

16   words?

17   A.    It's scanned through some computer program that picks up

18   words that are listed inside the resumé or whatever kind of

19   job description you want to submit.

20   Q.    So any -- would it be fair to say that any single

21   individual -- or actually without leading you, can you tell

22   us please if you're going to -- if anyone is going to promote

23   at Pantex what all their -- what all their resumé must say in

24   order to be promoted or in order to be considered for the

25   promotion.

A.    It would have to say something along the lines that --

honestly, I don't understand that question, so --

Q.    That's okay.  What does a resumé have to have in it in

order for Pantex to even consider your promotion?

A.    Key words.

Q.    And that's it?

A.    Yes.

Q.    All right.  Mr. Bullard, are you paid hourly, or are you

paid on a salary, or were you paid before you -- before when

you still worked at Pantex?

A.    I was hourly.

Q.    And why would -- why do you consider yourself an hourly

employee, sir?

A.    I was paid by the amount of hours I worked.

Q.    Okay.  If you wanted to leave early on a day of your

shift --

      By the way, how many hours were you scheduled normally

on a shift to work in a certain day?

            MR. HOWARD:   Objection, Your Honor.  This exceeds

the scope.

            THE COURT:  Well, I'll permit the question.

            MR. WEBSTER:   Thank you, Your Honor.

Q.    (By Mr. Webster)  If you wanted --

A.    It was like thirteen and a half hours a day times four

days a week.

1   Q.    Okay.  If you wanted to work on, say, a -- say, one day

2   you were on a shift for thirteen and a half hours, and you

3   only wanted to work seven hours that day, what would you have

4   to do to make up your time in order to get paid for your full

5   forty hours?

6   A.    I would submit for vacation or, if I was sick, sick

7   time.

8   Q.    They would always take that out of your leave, your bank

9   leave?

10  A.    Uh-huh.

11  Q.    What if --

12  A.    Yes, sir.

13  Q.    -- you only wanted -- what if you only needed two days

14  (sic)?  You wanted to leave at eleven and -- eleven and a

15  half hours and you needed two extra hours, what would they

16  do?

17  A.    Exact same thing.

18  Q.    Okay.  They would still force you even on short days --

19  on days that you just wanted to leave a little early, you

20  were still required to take the time?

21  A.    Yes.

22  Q.    Did you ever work short weeks or long weeks, Mr.

23  Bullard?

24  A.    Yes, I did.

25  Q.    And what was the process by which you did those?  I

1    mean, how would you submit your time?

2    A.    Long weeks, if I'm not mistaken, I worked like -- the

3    long weeks were four days per week, and that would equal to

4    eight days of work per paycheck.  And then short weeks were

5    three days per week, so it's six days per paycheck.  And

6    you'd submit the hours accordingly.

7    Q.    Okay.  If you'll turn to Defendant's Exhibit 6 that was

8    in front of you.  It's a big stack of supervisor activity

9    reports.

10   A.    Uh-huh.

11   Q.    Do you have those?

12   A.    Yes, sir.

13   Q.    Turn to PAN 3778 that Mr. Howard asked you about.

14   A.    I'm there.

15   Q.    On that day, it says, "Assist with weapon issue."

16   A.    Yes, sir.

17   Q.    What were you doing then?

18   A.    I was handing out weapons in the armory.

19   Q.    With respect to the -- it says, "The incident 06-081."

20   Do you see that?

21   A.    Yes, sir.

22   Q.    And that's where you wrote up -- you were required to

23   write up an incident report?

24   A.    Yes, sir.

25   Q.    Do you recall what this was over?

1  A.    No.   No, sir, not at all.

2  Q.    Does anyone at Pantex tell you, Mr. Bullard,

3  specifically to write up incident reports?

4  A.    Yes, sir.

5  Q.    Who tells you to do that?

6  A.    The shift commander.

7  Q.    This isn't some type of independent decision or

8  discretion that you use?

9           MR. HOWARD:   Objection --

10 A.    No.

11          MR. HOWARD:   -- Your Honor.   Leading the witness

12 again.

13          THE COURT:   Overruled.   But don't lead.

14          MR. WEBSTER:   Yes, ma'am.

15 A.    No.

16 Q.    (By Mr. Webster)  Okay.   Explain the process when you

17 would be required to write up an incident report and how that

18 generally worked when you were a field lieutenant at Pantex.

19 A.    The information would be passed from a SPO or somehow

20 arrives to the shift commander.   The shift commander would

21 get in touch with me and advise me to meet with an individual

22 that the report needs to be taken from, and I would make the

23 report at that time.

24 Q.    That was not something that you exercised -- well, let

25 me ask you this:   When you were -- when you were -- these

1    reports, you were ordered to write these up; this wasn't

2    something you decided on your own?

3    A.    Yes, sir.

4    Q.    Any time you had to report an on-the-spot -- did you --

5    did you always report on-the-spot corrections to your shift

6    commander?

7    A.    Yes, I did.

8    Q.    And why would you report those to the on -- to the shift

9    commander?

10   A.    He required it.  He wanted us -- he wanted to know about

11   every one of them.

12   Q.    Okay.  And after you reported the on-the-spot incidents

13   to your shift commander, would he then -- what type of

14   instruction would he then give you?

15   A.    Depending on the circumstances, I believe he would tell

16   me to carry out some sort of a punishment phase, if there's a

17   punishment needed, or have the SPO meet with him, whatever,

18   something like that.

19   Q.    Okay.  That wasn't -- was it -- did you have any

20   independent discretion or judgment with respect to the

21   punishment or what should be done to discipline a SPO?

22   A.    No, sir.

23   Q.    Okay.  Anything that happened on your shift, were you

24   required to report that to Mr. Reynolds?

25   A.    Yes, sir, I was.

1  Q.    Okay.  And was that his rules, or was that Pantex policy

2  and procedures?

3  A.    That's Pantex policy and procedures.

4  Q.    Do you believe, sir, that you had a -- you exercised a

5  large amount of authority as a -- as a field lieutenant at

6  Pantex?

7  A.    No.

8  Q.    Okay.  And why do you feel that way?

9  A.    My authority carried no weight.  We couldn't -- we never

10 were able to punish.  We weren't allowed to conduct any sort

11 of business without prior approval of the shift commander.

12 Q.    Do you know what The Breakfast Club is, sir?

13 A.    Yes, I do.

14 Q.    What is The Breakfast Club?

15 A.    It consists of a series of individuals who are in a

16 position where they are pretty much exempt from rules.

17 Q.    And were you a member of that club, sir?

18 A.    Absolutely not, sir.

19 Q.    Who all do you remember, sir, comprises under your --

20 with respect to the security police force, comprises the

21 members of The Breakfast Club?

22 A.    Larry Spaulding, Terry Voyles, Robert Roderick, Rick

23 Foust, Steve Reynolds; D.J., meaning Dickey Joe, Shead.

24 There were several -- several others.  I just don't remember

25 them all.

Jowell Bullard (Redirect--Plaintiffs)

1    Q.    Are you aware of any individuals, sir, that promoted

2    without going through the promotion board?

3    A.    I know that has happened in the past.  Let me think for

4    a second.

5          (Pause.)

6    A.    Get back with me on that one.  I can't think right now.

7    Sorry about that.

8    Q.    (By Mr. Webster)  All right.  Do you know what Steve

9    Solis' position was out at the -- out at Pantex, sir?

10   A.    He was in charge of -- of the hiring and firing of

11   the -- not firing, but hiring of the individuals, the new

12   recruits.

13   Q.    What was his -- what was -- oh, the hiring of new

14   recruits, new SPO's?

15   A.    Yes, sir.

16   Q.    Okay.

17   A.    Can I -- can I have you step back for a second?

18   Q.    Sure.

19   A.    You asked me just a second ago if -- if I knew of

20   someone that was promoted without an interview board.

21   Q.    Right.

22   A.    Steve Solis was, to captain.

23   Q.    Did you complain about that process to anyone at Pantex?

24   A.    Verbally, numerous people.

25   Q.    Okay.  And who -- tell us who all you complained about

Jowell Bullard (Recross--Defendant)

1   the fact that he had not had to go through the promotion

2   board.

3   A.    My immediate shift commander, James Martinez, I said

4   that to, who's the last shift commander I had before I was

5   terminated.

6         Steve Reynolds, I know probably -- I know he was

7   known -- made known of it.  I didn't directly tell him myself

8   though.

9         Several of my peers and other captains, other potential

10  captains were aggravated, and they expressed their concern

11  toward me.

12  Q.    Who was that?  That Solis --

13  A.    At that time, it would be -- it was Todd Finley, Bobby

14  Guthrie.  At this time, that's the only one I can think of

15  right now.

16  Q.    Did you ever hear Todd Finley's nickname?

17  A.    I probably did.  I can't remember right now.

18  Q.    You didn't work out at the range with Mr. Finley, did you?

19  A.    No, I did not.

20  Q.    Okay.

21        MR. WEBSTER:   I believe I'll pass the witness.

22                    RECROSS EXAMINATION

23  BY MR. HOWARD:

24  Q.    Are you aware that one of Steve Solis' duties was to

25  assign range hands to training activities?

Jowell Bullard (Recross--Defendant)

A.    I was not aware of any of Steve Solis' duties, besides
hiring people.

Q.    Okay.  So you're not aware that one of his duties for
the last few years was to assign range hands to range
activities?

A.    If you say so.

Q.    Sir, we talked about -- you talked about on-the-spot
corrections for just a minute, and I'd like to just clarify
that a bit.

      Wouldn't you agree that, without first receiving any
direction from Steve Reynolds, you were authorized to issue
on-the-spot corrections?

A.    A person is authorized to conduct on-the-spot
corrections.  However, I never did without being -- I never
did before being advised by Steve Reynolds.

Q.    Well, in your deposition, do you recall saying:  "Were
you also authorized to issue on-the-spot corrections on your
own without first receiving that direction from Steve
Reynolds?"

      Do you --

A.    Yes.

Q.    -- recall that?

A.    I'm authorized -- you're right.  I am authorized to do
that.

Q.    But wasn't your style more to handle people a little bit

Jowell Bullard (Recross--Defendant)

1  informally?

2  A.    Yes, it is.

3  Q.    That was the way that you handled discipline on your

4  shift; isn't that correct?

5  A.    To our discretion is the way we handled the discipline,

6  yes, it is.

7  Q.    Okay.  And, in fact, you said that you liked to handle

8  it by steering them more the right way rather than issuing a

9  written on-the-spot correction; isn't that correct?

10 A.    If that's what I said.

11 Q.    Well, if you -- that's what you said in your deposition,

12 isn't it?

13 A.    What page are you on?  So I can be on the same sheet of

14 music as you.

15 Q.    Page 21.

16 A.    What part?

17 Q.    The very first part.  Do you recall this answer:  "I

18 wouldn't refer to them as on-the-spot corrections.  I would

19 refer to them as more of a steering them the right way.  I

20 handled it."

21       That was your testimony, wasn't it?

22 A.    That's -- that's exactly what I said then, right there.

23 Q.    "As a leader, I handled it quite differently."  Isn't

24 that correct?

25 A.    That's what it says.

Jowell Bullard (Recross--Defendant)

1  Q.   And, in fact, you said:  "I lead by example.  I see them

2  messing up, I would demonstrate.  I wouldn't just tell them.

3  I would say, 'This is how it's done; let's do it this way,'

4  instead of saying, 'You do it that way.'"

5  A.   Yeah.  You're defining a leader, not a supervisor.

6  Q.   And that's how you would supervise; isn't that correct?

7  A.   That's how I'd lead.

8  Q.   But we were talking about your lieutenant duties, so

9  that's how you would lead as a lieutenant; isn't that correct?

10  A.   That's how I lead as a person.

11  Q.   And as a lieutenant; isn't that correct?

12  A.   I guess a person has to be a lieutenant, so yes.

13  Q.   And you would also instruct them by example rather than

14  just talking to them; isn't that correct?

15  A.   That's redundant.  I don't have any objections on that

16  one.

17  Q.   You would instruct them by example rather than just

18  talking to them; isn't that correct?

19  A.   Yes.

20  Q.   And, in fact, you would not usually document that in

21  your activity logs at all; isn't that correct?

22  A.   Just talking to somebody; is that what you're asking?

23  Q.   Yes, sir.  You --

24  A.   Whether I'd document that in my activity log, just

25  speaking with people?

Jowell Bullard (Recross--Defendant)

1   Q.   Yes, sir.  If you engaged in these activities that we

2   just talked about, you wouldn't document that in your

3   activity log, would you?

4   A.   By just speaking with people, no.

5   Q.   You talked a little bit about how the -- the key words

6   in your -- in your resumé, but the resumé that we looked at,

7   you prepared that not for a position at Pantex but for a

8   position with the Amarillo Police Department; isn't that

9   correct?

10  A.   That's basically like what I refer to as a cookie-cutter

11  resumé.  It was already established.  All I did was add and

12  subtract certain portions that would benefit me to get that

13  position just the same way I did with Pantex.

14  Q.   And what I'm asking is that you submitted this resumé

15  that you were talking about in your testimony to APD; isn't

16  that correct?

17  A.   I did submit it to APD.

18          MR. HOWARD:   Pass the witness.   Thank you.

19          MR. WEBSTER:   No further questions, Your Honor.

20          THE COURT:   May the witness be excused altogether?

21          MR. HOWARD:   Yes, Your Honor.

22          MR. WEBSTER:   (Nods head.)

23          THE COURT:   You are excused altogether as a witness.

24      (Witness excused.)

25      (End of requested excerpt.)

Excerpt Index

1                      VOLUME I (PAGES 1 - 36)

2

3                  PROCEEDINGS FOR AUGUST 20, 2008

4                                                                    <u>PAGE</u>

5    CAPTION.......................................................    1

6    APPEARANCES...................................................    3

7    REQUESTED TRIAL EXCERPT FOR AUGUST 20, 2008 .................    4

8

9

10                      <u>PLAINTIFFS' EVIDENCE</u>

11

    <u>WITNESS:</u>              <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>   <u>VOIR DIRE</u>
12
    JOWELL BULLARD             4       12       21        32
13

14

15

16   WITNESS EXCUSED...............................................   36

17

18

19

20

21

22

23

24

25

Reporter's Certificate

1                   *   *   *   *   *   *

2          I certify that the foregoing requested excerpt is a

3    correct transcript from the record of proceedings in the

4    above-entitled matter.  I further certify that the transcript

5    fees format comply with those prescribed by the Court and the

6    Judicial Conference of the United States.

7

8    s/Stacy Mayes Morrison___              11/5/2008_____
9    Stacy Mayes Morrison                   Date
     Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25