

FILED

JUNE 17, 2009
KAREN S. MITCHELL
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF TEXAS

## AMARILLO DIVISION

| | | |
|---|---|---|
| **JOWELL C. BULLARD, et al,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **vs.** | § | **Civil Action  2:07-CV-049-J** |
| | § | |
| **BABCOCK & WILCOX TECHNICAL** | § | |
| **SERVICES PANTEX, L.L.C.,** | § | **NON-JURY** |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER and
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case is brought pursuant to the Fair Labor Standards Act of 1938 alleging partially unpaid overtime due to first-responder fire-safety supervisors and protective force supervisors at Pantex.  Pantex is the final assembly point and the only disassembly location for all nuclear weapons in the United States' arsenal.  It is a U.S. Department of Energy facility operated and managed by Defendant Babcock & Wilcox Technical Services Pantex, L.L.C. (B&W).  Plaintiffs are B&W employees who are Lieutenants and Captains in the Pantex Protective Forces  (Pro Force), the Pantex Fire Safety Department, and Pantex's training curriculum development department.

The ten specific employment positions at issue in this case are set forth in the filed stipulations.   The Pro-Force positions are: 1) Curriculum Developer, 2) Field Lieutenant, 3) Construction Lieutenant, 4) Central Alarm Station (CAS) Lieutenant, 5) Training Lieutenant, 6) Desk Lieutenant, 7) Administrative Lieutenant, 9) Training Captain, and 10) Special Response Team (SRT) Captain.  The relevant Fire Safety position is Fire Lieutenant.  The Plaintiffs have served and/or currently serve in one or more of these positions within the relevant time period.

Plaintiffs are paid "premium pay" for all hours worked in excess of forty hours per week, calculated as straight time based upon their regular hourly rate of pay.  Defendant offered testimony that the purpose of "premium pay" is to make sure that exempt employees earn more annually than non-exempt employees who work significant overtime.

Plaintiffs contend that under the law they are non-exempt employees who should be paid overtime at the rate of one and one-half times their regular hourly rates, instead of the straight time premium paid by the Defendant.

The primary and most important mission and duty of the Pantex Protective Forces is to deny access to nuclear materials stored at Pantex.  The primary mission and duty of the Pantex Fire Safety Department is to prevent and suppress fires at Pantex.  In addition, pursuant to a memorandum of understanding with local governmental units Pantex fire department employees frequently and regularly have the duty to act as emergency medical and fire suppression "first responders" at auto accidents occurring outside the Pantex facility.

This case was tried to the bench.  The parties filed extensive stipulations which are adopted as findings of fact and are incorporated in this opinion and order by reference.

## CONCLUSIONS OF LAW

### *The FLSA*

The  Fair Labor Standards Act of 1938, 29 U.S.C. §§ 213 *et seq.* (FLSA), requires covered employers to pay their nonexempt employees overtime pay of time and one-half the regular rate of pay for hours worked in excess of forty (40) in a work week.  The FLSA contains a number of exemptions from the minimum wage and overtime pay requirements. Section 13(a)(1) of the FLSA provides an exemption from the federal minimum wage and overtime requirements for employees employed in *bona fide* executive and administrative capacities, or combinations thereof, and for

certain highly compensated employees, as these terms are defined and delimited by regulations of the Secretary of Labor.  29 C.F.R. § 541.0.

The Dept. of Labor's regulations interpreting the exemptions constitute the agency's "body of experience and informed judgment" about the statute, so they should be given "considerable and in some cases decisive weight." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).  While these administrative rulings do not have the binding effect of law, courts may not only properly resort to them for guidance but should also accord them the weight, persuasiveness, and respect to which the expertise of their formulators entitles them.  *See e.g. Mabee v. White Plains Publishing Co.*, 327 U.S. 178, 182, 66 S.Ct. 511, 90 L.Ed. 607 (1946); *Irwin v. Clark*, 400 F.2d 882, 884 (9th Cir. 1968), *cert. denied* 393 U.S. 1062, 89 S.Ct. 715, 21 L.Ed.2d 706 (1969).

 "The section 13(a)(1) exemptions and the regulations in this part do not apply to manual laborers or other 'blue collar' workers who perform work involving repetitive operations with their hands, physical skill and energy."  29 C.F.R. § 541.3(a).

### *Exemptions from FLSA Coverage*

Exemptions from FLSA minimum wage and maximum hour requirements for employees serving in a *bona fide* executive or administrative capacity are to be "narrowly construed against the employer, and their application limited to those plainly and unmistakably within their terms and spirit."  *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 80 S.Ct. 453, 456, 4 L.Ed.2d 393  (1960); *Secretary of Labor, U.S. Dept. of Labor v. 3Re.com, Inc.,* 317 F.3d 534 (2003).  The burden of proving these exemptions is upon the employer, and if the record is unclear as to some exemption

requirement the employer will be held not to have satisfied its burden. *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206, 86 S.Ct. 737, 747, 15 L.Ed.2d 694 (1966).

"[T]he exemption is not lost if an exempt employee who is guaranteed at least $455 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek. Such additional compensation may be paid on any basis (e.g., ... straight-time hourly amount, time and one-half or any other basis), and may include paid time off." 29 C.F.R. § 541.604(a).

### Highly-Paid Exemption

The test for the highly-paid exemption is set forth at 29 U.S.C. § 541.601(a), which states: "An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs *any one* or more of the exempt duties or responsibilities of an executive, administrative or professional employee identified in [... § 541.100 *et seq.*]." (emphasis added).

### Combination Exemption

"Employees who perform a combination of exempt duties as set forth in the regulations in this part for executive, [and] administrative ... employees may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption. In other words, work that is exempt under one section of this part will not defeat the exemption under any other section." 29 C.F.R. § 541.708.

### The Executive Exemption

The regulatory exemption for Executive Employees is in C.F.R. § 541.100, which states that an employee is employed in a "*bona fide* executive capacity" for purposes of the exemption if the employee is:

> "(1) Compensated on a salary basis at a rate of not less than $455 per week ..., exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."

To determine whether an employee's suggestions and recommendations are given "particular weight," DOL regulations give the following factors to be considered (including, but not limited to):

> • "whether it is part of the employee's job duties to make such suggestions and recommendations;"
>
> • "the frequency with which such suggestions and recommendations are made or requested; and"
>
> • "the frequency with which the employee's suggestions and recommendations are relied upon."

29 C.F.R. § 541.105.  "An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status."  29 C.F.R. §541.105.

***Primary Duty***

> "The term 'primary duty' means the principal, main, major or most important duty
> that the employee performs. Determination of an employee's primary duty must be
> based on all the facts in a particular case, with the major emphasis on the character
> of the employee's job as a whole. Factors to consider when determining the primary
> duty of an employee include, but are not limited to, the relative importance of the
> exempt duties as compared with other types of duties; the amount of time spent
> performing exempt work; the employee's relative freedom from direct supervision;
> and the relationship between the employee's salary and the wages paid to other
> employees for the kind of nonexempt work performed by the employee."

29 C.F.R. § 541.700(a). "The amount of time spent performing exempt work can be a useful guide

in determining whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b).

"Thus, employees who spend more than 50 percent of their time performing exempt work will

generally satisfy the primary duty requirement." *Id.* "Time alone, however, is not the sole test, and

nothing in this section requires that exempt employees spend more than 50 percent of their time

performing exempt work." *Id.* "Employees who do not spend more than 50 percent of their time

performing exempt duties may nonetheless meet the primary duty requirement if the other factors

support such a conclusion." *Id.*

"Occasional, infrequently recurring tasks that cannot practicably be performed by

nonexempt employees, but are the means for an exempt employee to properly carry out exempt

functions and responsibilities, are considered exempt work." 29 C.F.R. § 541.707. "The following

factors should be considered in determining whether such work is exempt work: Whether the same

work is performed by any of the exempt employee's subordinates; practicability of delegating the

work to a nonexempt employee; whether the exempt employee performs the task frequently or

occasionally; and existence of an industry practice for the exempt employee to perform the task."

*Id.*

Work that is "directly and closely related" to the performance of exempt work is considered exempt work.  29 C.F.R. § 541.703(a).  "Directly and closely related" work includes physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly.  *Id.*  Work "directly and closely related" to the performance of exempt duties may also include record keeping; monitoring and adjusting machinery; taking notes; using the computer to create documents or presentations; opening the mail for the purpose of reading it and making decisions; and using a photocopier or fax machine.  *Id.*

"The following examples ... illustrate the type of work that is and is not normally considered as directly and closely related to exempt work:

(1)  Keeping time ... records for subordinates is work directly and closely related to an exempt executive's function of managing a department and supervising employees.

(2)  The distribution of materials ... or supplies to maintain control of the flow of and expenditures for such items is directly and closely related to the performance of exempt duties.

(3)  A supervisor who spot checks and examines the work of subordinates to determine whether they are performing their duties properly ... is performing work which is directly and closely related to managerial and supervisory functions, so long as the checking is distinguishable from the work ordinarily performed by a nonexempt inspector.

(4)  A supervisor who sets up a machine may be engaged in exempt work, depending upon the nature of the industry and the operation.  In some cases the setup work, or adjustment of the machine for a particular job, is typically performed by the same employees who operate the machine.  Such setup work is part of the production operation and is not exempt.  In other cases, the setting up of the work is a highly skilled operation which the ordinary production worker or machine tender typically does not perform."

29 C.F.R. § 541.703(b).

### *The Administrative Exemption*

The applicable test for the administrative exemption is set forth at 29 C.F.R. § 541.202.

Regarding "discretion and independent judgment," 29 C.F.R. § 541.202 states:

(a) To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance.  In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.  The term "matters of significance" refers to the level of importance or consequence of the work performed.

(b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises.  Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

(c) The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision.  However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level.  Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.  The decisions made as a result of the exercise of discretion and

independent judgment may consist of recommendations for action rather than the actual taking of action. ...

  (d) An employer's volume of business may make it necessary to employ a number of employees to perform the same or similar work.  The fact that many employees perform identical work or work of the same relative importance does not mean that the work of each such employee does not involve the exercise of discretion and independent judgment with respect to matters of significance.

  (e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources.  See also § 541.704 regarding use of manuals. The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work.  An employee who simply tabulates data is not exempt, even if labeled as a "statistician."

  (f) An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly.

"The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section 13(a)(1) of the Act or the regulations in this part."  29 C.F.R. § 541.704.  "The section 13(a)(1) exemptions are *not* available, however, for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances."  29 C.F.R. § 541.704 (emphasis added).

### *Fire Fighters, Paramedics, EMTs, Rescue, and Hazardous Materials Workers*

In addition to the partial overtime exemption regulations set forth in Section 553 for "specified public agency employers," Part 541, 29 C.F.R. § 541.3(b), a Department of Labor FLSA regulation effective April 23, 2004, for fire fighters, paramedics, EMT, rescue workers and workers who work with hazardous materials, states (emphasis added):

> "(b)(1) The section 13(a)(1) exemptions and the regulations in this part [Part 541] also do *not* apply to *police officers*, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers, park rangers, *fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire,* crime *or accident victims;* preventing or detecting crimes; conducting investigations or inspections for violations of law; *performing surveillance*; *pursuing, restraining and apprehending suspects*; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; *or other similar work.*

Such employees do *not* qualify as exempt executive employees, exempt administrative employees, or exempt professionals.

### Trainees

"The executive, administrative, [and] professional ... employee exemptions do not apply to employees training for employment in an executive, administrative, [or] professional, ... employee capacity who are not actually performing the duties of an executive, administrative, [or] professional ... employee." 29 C.F.R. § 541.705./[1]

### Job Titles are Insufficient

"A job title alone is insufficient to establish the exempt status of an employee. The exempt

---

[1]        This regulation applies to Plaintiff Randy Stokes, who was in training for the position of curriculum developer before being recalled to CAS Lieutenant duty at Pantex. While a trainee he was not in an exempt position. However, no party has quantified the amount of overtime work, if any, he or any other employee who worked in a trainee position performed while in trainee status.

or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."  29 C.F.R. §541.2.  General job descriptions contained in an employee's resume or prepared by the employer may be considered in determining whether employee is exempt administrative employee under overtime provisions of FLSA, but are not determinative.  *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 401 (6th Cir. 2004).

### Collective Bargaining Agreements (CBAs)

While they may be relevant to explain some employment practices, collective bargaining agreements cannot waive or reduce the Fair Labor Standards Act's protections.  29 C.F.R. § 541.4.

### Liquidated Damages

The Portal-to-Portal Act amendments to the FLSA subject an employer who willfully violates the Fair Labor Standards Act to back pay awards for three, rather than two, years.  29 U.S.C.A. § 255 (West 1985). Section 16(e) of the FLSA, 29 U.S.C. § 216(c), subjects a person to a civil penalty "who repeatedly *or* willfully violates' the minimum wage or overtime requirements of the Act, 29 U.S.C. § 216(e), and the regulations implementing that provision require that "[a]ll of the facts and circumstances surrounding the violation shall be taken into account in determining whether a violation was willful."  29 C.F.R. § 578.3(c).  *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128,131 (1988)(standard for willfulness is whether the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute).

Pursuant to § 11 of the Portal-to-Portal Act, 29 U.S.C. § 260, liquidated damages may be avoided "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not in violation of the [Act]."  Under 29 U.S.C. § 260, the employer bears the burden of establishing, by "plain and substantial" evidence, subjective good faith and objective reasonableness.  *Barcellona v. Tiffany English Pub, Inc.* 597 F.2d 464, 468 (5th Cir. 1979)(citing *Rothman v. Publicker Indus.,* 201 F.2d 618, 620 (3rd Cir. 1953).  *See also  Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991); *see Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987).  The burden, under 29 U.S.C. § 260, "is a difficult one to meet, however," and an award of additional "damages are the norm, single damages the exception . . ..'"  *Wilamowsky*, 833 F.2d at 19 (quoting *Walton v. United Consumers Club, Inc*., 786 F.2d 303, 310 (7th Cir. 1986)).

Even if the district court determines that the employer's actions were taken in good faith and based on reasonable grounds, the court still retains the discretion to award liquidated damages. *Id.; Heidtman v. County of El Paso, Texas,* 171 F.3d 1038 (5th Cir. 1999); *Lee v. Coahoma County, Mississippi,* 937 F.2d 220, 227 (5th Cir. 1991).

Where the employer *suspects* that it was not in full compliance with the FLSA the employer can not act in good faith based on reasonable grounds. *Heidtman*, 937 F.2d at 1042. When the employer suspects that it is out of compliance with the FLSA, it is an abuse of discretion for the district court *not* to award liquidated damages. *Id. See, e.g.,McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-34, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988); *Barcellona v. Tiffany English Pub, Inc.,* 597 F.2d 464, 468-69 (5th Cir. 1979).

To carry its good faith burden, the employer must show that it took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions. The fact that an employer has broken the law for a long time without complaints from employees does not demonstrate the requisite good faith required by the statute. Moreover, the employee need not establish an intentional violation of the Act to recover liquidated damages. Instead, the employer must affirmatively establish that it acted in good faith by attempting to ascertain the Act's requirements. *Williams vs. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3rd Cir. 1984).

Liquidated damages under the FLSA are considered compensatory rather than punitive in nature. *See Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697, 707, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991). They "constitute[ ] compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." *Brooklyn Sav. Bank*, 324 U.S. at 707, 65 S.Ct. at 902; *see also United Consumers Club*, 786 F.2d at 310 ("Doubling [damages under the FLSA] is not some disfavored 'penalty.' [The Portal-to-Portal Act] made doubling discretionary rather than mandatory, but it left a strong presumption in favor of doubling, a presumption overcome only by the employer's 'good faith ... and reasonable grounds for believing that [the] act or omission was not a violation.'").

"Good faith" requires more than ignorance of the prevailing law or uncertainty about its application. It requires an employer take active steps to ascertain the dictates of the FLSA from, for example, the Administrator of the Wage and Hour Division of the Department of Labor, and then

move to comply with them.  *See Cooper Elec.*, 940 F.2d at 908.  *See also Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984).  That an employer did not purposefully violate the provisions of the FLSA is not sufficient to establish that it acted in good faith.  *Cooper Elec.*, 940 F.2d at 909.  Nor is good faith demonstrated by the absence of complaints on the part of employees, *see Tri-County Growers*, 747 F.2d at 129, or simple conformity with industry-wide pay practice, *see Cooper Elec.*, 940 F.2d at 910; *Wilamowsky*, 833 F.2d at 19-20.  *See also Roy v. County of Lexington, South Carolina*, 141 F.3d 533, 543 (4th Cir. 1998); *Hodgson v. Square D Co.*, 459 F.2d 805, 809 (6th Cir. 1972)(reliance on the statements of anyone other than the Administrator of the Wage and Hour Division of the Department of Labor, such as a regional director, do not satisfy the § 259 "agency" immunity requirements).

## FINDINGS OF FACT[2]

### *Training Department Employees*

As a general rule Training Lieutenants and Captains work outside at one or more of the nine live fire weapons firing ranges and tactical training/simulation areas daily.  They also work within a training classroom, where they train according to a written lesson plan on each weapon and on each day's training subjects.  Office work is typically less than 10% of their day.

On a typical day 90% of Training Lieutenants' time is spend on the ranges training up to 40 Pantex security police officers (SPOs) in procedures, tactics and weapons proficiency.  Their primary duty is to teach how to be an effective, or more effective, SPO or SRT member.  They teach employees how to fire weapons, apply steel and plastic handcuffs, take down opponents, engage in hand to hand combat, and properly apply choke holds.  They teach and train in tactics.  They teach by doing, generally by direct display of actions directed upon other training supervisors.

Ordinarily, at the beginning of each day they draw heavy weapons and ammunition from the

---

[2]        Any finding of fact constituting in whole or in part a conclusion of law shall be deemed a conclusion of law.  Any conclusion of law constituting in whole or in part a finding of fact shall be deemed a finding of fact.

armory and transport it to the ranges.   Training Lieutenants mow the grass on the training ranges as needed.  They mop the indoor ranges, shovel snow and ice, and use snowblowers to remove snow when necessary from both the firing ranges and Pro-Force guard headquarters.

Training Lieutenants routinely set up and reset wooden, paper and steel shooting targets weighing between five to 75 pounds.  Some steel targets which are regularly used and moved weigh up to approximately 200 pounds.  SPOs are not permitted to move targets inside the firing ranges' "shoot houses" – live fire simulation environments inside a large, open-walled training building.

Training Lieutenants regularly move rapidly through obstacle courses, crawling, running, stooping, climbing and kneeling.  They regularly drag 180 pound life-sized dummies, move sand bags weighing from 30 to 100 or 120 pounds, and move heavy steel and wood "lead traps" and targets around training areas to reset training areas for the next group of trainees.  Their duties require the regular and frequent expenditure of physical labor, significant energy and great exertion. Such labors are inextricably combined with their daily exempt duties on a regular basis.

Like Training Lieutenants, a Training Captain can suggest changes and modifications to training course curriculum.  However, neither Training Lieutenants or Training Captains are authorized to implement such changes or modifications before they are approved by management. A Training Captain's primary duty is to supervise their Lieutenants and SPO trainees.

### *Central Alarm Station Lieutenants*

Alarm station employees work inside the central alarm station (CAS) or at backup alarm stations (SAS).  These stations serve as the eyes and ears of Pantex, controlling up to 60 different camera systems and other intrusion detection alarm systems.  The CAS Lieutenants' primary

function or job is to supervise alarm technicians to ensure that all alarms are being properly monitored and that proper procedures are followed when an alarm occurs. The majority of their time is spent supervising technicians and, to do that job, they co-monitor the alarm panels which the technicians are monitoring. They work in an office environment. Their daily duties do not require the regular and frequent expenditure of energy and exertion.

### *Construction Lieutenants*

The Construction Lieutenants supervise SPOs at the perimeter of and inside areas at Pantex which are undergoing construction. They usually work a morning or evening shift of five days per week, plus overtime as wanted or needed. Their primary duty is to supervise the control of unauthorized access into and out of those areas, and to monitor for unauthorized actions within their assigned area. To accomplish their duties they supervise subordinate SPOs within their assigned area. Their usual duties do not require the regular and frequent expenditure of significant energy and exertion, other than when they undertake mandatory training exercises and are required to meet annual physical tests (as do all Protective Force and Fire Safety positions at issue in this suit).

### *Field Lieutenants*

The Field Lieutenants work at and between observation posts surrounding the perimeter of the Pantex facility. A Field Lieutenant's primary duty is to supervise their SPOs, who are charged with controlling access into and out of Pantex, either through authorized access points (gates) or unauthorized locations (perimeter fences, etc.). To do their job they frequently travel from location to location, observation post to observation post, to supervise subordinate SPOs within their assigned areas. They spend little time in an office. The majority of their time – far more than 50% – is spent traveling by vehicle from post to post, and within field locations. Usually less than 10%

of their time is spent doing paperwork.  They inventory weapons in the armory, get briefed on events, and check their SPOs' equipment and mental fitness for duty each day.  If they need anything or need questions answered, they consult higher management as needed.  Their usual duties do not require the regular and frequent expenditure of significant energy and exertion, other than when they have to climb the stairs at guard tower posts, climb up on top of their vehicles, undertake mandatory training exercises, and are required to meet annual physical tests.

New Construction and Field Lieutenants are given one week of initial training, then do "ride alongs" with more experienced supervisors for on-the-job training.  They wear 40 to 55 pounds of equipment on them as they make their rounds.  They can climb 50 foot towers on a regular basis.

### Special Response Team Lieutenants

The SRT positions are special weapons assault team (SWAT) members who work or train at multiple locations.  Their primary duty and responsibility is to respond with force to any location where a problem occurs or may occur, either at a perimeter location or within internal area of Pantex.  A SRT Lieutenant's primary duty is to supervise their SPOs.  To do that, they routinely go where the SWAT team goes, and generally do what their subordinate team members need to do to project force – climbing a wall, entering a building with force, scaling a fence, fire a weapon, etc.  A SRT Captain's primary duty is to supervise their Lieutenants and their SPOs.

### Desk and Administrative Lieutenants

The desk and administrative supervisory positions work within Pro-Force offices inside the Pantex facility.

#### Administrative Lieutenants

Since the creation of the position in 2006, Administrative Lieutenants keep track of the

schedules for SPOs training, medical and other appointments.  Scheduling appointments is a task done pursuant to DOE policies and mandates.  They have limited authority in the absence of the Shift Commander (usually a Lt. Colonel, but it might on occasion be a lower ranking officer such as a Major) to authorize temporary absences for personnel who need to leave work early or who call in that they have to report in late for work that day.  However, it is the Shift Commander who has the authority to schedule vacations and approve absences, and the Shift Commander on each work shift retains overall responsibility for what goes on during his work shift.  They answer the telephones, and run the "key service" (that is, they dispatch SPOs to unlock doors and gates upon request by authorized Pantex employees)./[3]

*Desk Lieutenants*

Desk Lieutenants view, print off and consult computer generated, CBA-approved lists of Pro-Force personnel who are to work each day, and who may be called for potential overtime work on any given workday.  They enter time, assist in making schedule work changes, and give a copy of a work roster printout to the Lt. Colonel daily.  They can assign shift personnel to work in critical and non-critical locations, pursuant to standing DOE orders as to what areas must be covered and which are not designated "critical" areas but are considered "non-critical" areas, and print off and make minor adjustments to a shift's duty roster as needed.  They call workers in for overtime, but have no discretion regarding who gets called in for overtime work.  These Desk Lieutenant jobs can take from two to six hours each day.  The Desk Lieutenants' most important function is to print off the daily work roster and give it to their Lt. Colonel each day.  Their second most important function

---

[3]   The Protective Forces have keys to just about everything at Pantex.  If someone needs to get in somewhere, they call the Admin. Lt. on duty to arrange that.  However, key service approval is not up to the Lt. on duty; if the person calling is on the Pantex approved list, they get in.  If not, they do not.

is to go down the CBA-approved "call list" to get Pro-Force personnel to come in to work overtime.

Both of these Lieutenants' job duties call for them to apply well-established policies, techniques and procedures (as described in manuals and standing orders, specific limitations set by the Pantex Collective Bargaining Agreement, and instructions from the Pro-Force Chief, the Shift Commander and the Department of Energy, and B&W Pro-Force policy and procedural sources) within closely prescribed limits to determine the correct response to an inquiry, request or a set of circumstances. Every decision they make is either approved by the Shift Commander in advance under standing orders or established policies and procedures, or must be approved by the Shift Commander. Their daily duties do not require the regular and frequent expenditure of energy and exertion. Desk Lieutenants or Administrative Lieutenants do not exercise the primary duty of management or supervision of the enterprise in which these employees are employed (i.e., Pantex), or a customarily recognized department or subdivision thereof (i.e., the Pro-Force), as the term "management" is properly construed under 29 U.S.C. § 541.100 and under the facts of this case. That management and supervision job lies with each Shift Commander.

### *Curriculum Developers*

The Curriculum Developers' position is non-supervisory. Their primary duty is to update existing training manuals and, upon occasion where new weapons or defensive equipment are purchased, to provide an initial draft of proposed training manuals.

Since the late 1990s Pantex has purchased one weapon and one portable radar system for which new training or maintenance manual had to be developed. Such new manuals can take a minimum of several years to be finally approved by subject matter experts, the DOE, and upper Pantex managers. The developers' job calls upon them to consult with specialists, in-house experts,

and subject matter experts to update existing training manuals.  When a curriculum is nearing completion (ex., deletions completed of old tasks that are no longer done, updating of tasks that are still being done, addition of new tasks for new equipment) it is sent to the various experts for corrections and approval, then to the curriculum development department manager and elsewhere for approvals.

There are several hundred existing curriculum training courses at Pantex, all of which must be reviewed and updated, as necessary, on an annual basis.  These job duties call for Curriculum Developers to apply well-established policies, techniques and procedures (as described in existing manuals and in standing orders and instructions from the Department of Energy, in pre-existing B&W manuals, from manufacturer's owners and/or suggested training manuals, and from other pre-existing Pro-Force policy and procedural sources) within prescribed limits to determine the correct response to a given set of circumstances.  They have no authority to give approval to final job tasks analysis or to waive policies or procedures as set by DOE or Pantex.  Their daily duties do not require the regular and frequent expenditure of energy and exertion.

*Fire Lieutenants*

The Fire Lieutenant position works all over Pantex, in and around the fire station, and off the Pantex premises.  At various times relevant to this lawsuit Fire Lieutenants have concurrently served as emergency medical technicians (EMT) and/or paramedic personnel.  The primary mission and duty of a Pantex Fire Lieutenant is to prevent and suppress fires at Pantex and to frequently and regularly act as emergency medical and fire suppression "first responders" at auto accidents occurring outside the Pantex facility, and to supervise their crew in those duties.

Fire Lieutenants who are also certified EMTs and paramedics frequently and regularly act

-19-

as hands-on "first responders" at auto accidents.  On average there is one fire every two to three years at Pantex where hoses are deployed.  During the times relevant to this lawsuit there have been hundreds of auto accidents to which Pantex personnel have responded.

Fire Lieutenants can recommend discipline and suggest appropriate punishments, but the Court does not find that such recommendations are followed.  The Fire Chief at Pantex has a very "hands on" style of management, on matters large and small.  For example, he decides what type of t-shirt can and can not be worn in the fire station, and when.  He makes the decisions on discipline.

Fire Lieutenants have to take and pass annual physical tests.  Higher ranking officers in the fire department do not.  When they are not fighting fires or responding to auto accidents, Fire Lieutenants' usual duties are to clean the fire station and their fire-fighting equipment, conduct routine fire extinguisher checks of the approximately 2,400 fire extinguishers at Pantex, and run "walk down plans" – checks upon the accuracy of pre-fire plans and plans on known fire hazards and hazardous materials in buildings and areas at Pantex.  Their job duties require the regular and frequent expenditure of significant energy and exertion.

## *Analysis*

Defendant relies upon the executive and administrative exemptions, and combinations thereof, the highly compensated employee exemption, and supervisor status in the Department of Energy's Human Reliability Program (HRP).

### *Supervisor Status in the Human Reliability Program*

The HRP is a DOE required program which was implemented at Pantex in February, 2004.

-20-

HRP supervisors have been trained to report questionable employee activities in 12 areas, and are trained to observe various human factors, including questionable personnel actions and mental states, medical issues, stress, financial difficulties, workplace conflicts, being short-tempered, family discord, divorce, poor work performance, tardiness, emotional problems, inattentiveness, memory loss or difficulties, and other factors. Defendant alleges that all plaintiffs are HRP supervisors because of their positions, and that status makes Plaintiffs' positions FLSA exempt.

Any job position at Pantex can be HRP supervisor trained. Pantex has been covered under the DOE HRP requirements since at least 1999, and every employee and every job position at Pantex has HRP responsibilities because HRP responsibilities are mandatory for all Pantex employees under federal law. Pantex union members can and do report under the HRP, as does the Pantex medical department. The majority of HRP reports are from the Pantex medical department.

No HRP supervisor can fire an employee. He or she can not pull any security clearances, which are essential to working in Pantex work areas. It is an "observation and reporting" position. It does not give any such employee any authority in matters of hiring, or the authority or power to hire or fire, or advance or promote any Pantex employee. They are not asked by management to make promotion recommendations, and do not make suggestions or recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees because they have HRP supervisory status.

They do not customarily and regularly direct the work of two or more employees merely because they are HRP supervisors. They do not have the primary duty of management of the enterprise in which the HRP supervisor is employed or of a customarily recognized department or subdivision thereof. They have no input into financial matters or decisions, or Pantex management decisions, because they have certified HRP supervisor status. A HRP supervisor is trained to fill out

HRP forms after going over the form with employees, to have the employee sign the form, to sign the form himself or herself, and to turn the form in to the human resources department. Management personnel in that and other departments make all resulting management judgments.

The Court does not find that the status of being a HRP supervisor makes any job position at issue in this suit an exempt position under the executive or administrative exemptions, or a combination thereof.

### Executive Exemption

The § 13(a)(1) exemptions may apply to protective force Construction and Field Lieutenants, CAS Lieutenants, SRT Captains, Training Lieutenants and Captains, and Fire Lieutenants so long as those employees meet all of the requirements set out in the Regulations./[4]  *See West v. Anne Arundel County, Maryland*, 137 F.3d 752 (4th Cir.), *cert. denied*, 525 U.S. 1048 (1998)).

Because the parties agree that the salary requirements of the regulation are met and Construction and Field Lieutenants, CAS Lieutenants, SRT Captains, Training Captains, and Fire Lieutenants customarily and regularly direct the work of two or more employees, application of the exemption to these six protective force and fire safety positions at issue turns on whether the positions meet the "primary duty" requirements of § 541.100(a)(2) and whether these supervisors are employees whose suggestions and recommendations as to advancement, promotion or any other change of status of other employees are given "particular weight."

### Recommendations as to Advancement, Promotion or any Other Change of Status

_____

[4]        All of these listed positions are alleged by the Defendant to be exempt under the executive exemption. The term "exempt work" means all work described in §§ 541.100, 541.101, 541.200, 541.300, 541.301, 541.302, 541.303, 541.304, 541.400 and 541.500, and the activities directly and closely related to such work.  29 C.F.R. § 541.702.  All other work is considered "nonexempt."  *Id.*

*Fire Department Positions*

The Court does not find that Fire Safety Lieutenants are asked by management to make promotion recommendations or make suggestions or recommendations as to the hiring, firing, advancement, promotion or any other change of status of other fire department employees which are given significant weight by the Fire Chief.  There are fewer openings for promotions in the Pantex Fire Department supervisory ranks, and the Fire Chief has the sole authority to promote.  He is always on Fire Department promotion boards.

*Protective Force Positions*

No employee in any of Plaintiffs' job positions make suggestions or recommendations which are given weight as to matters of hiring, and none of the Plaintiffs have ultimate authority to hire, fire, or advance or promote any Pantex employee.

Management asks for and considers positive and negative recommendations of subordinates either informally conveyed orally or formally recorded on written rec/non-rec forms to be given to the Promotion Board.  Any supervisor is free to submit rec/non-rec forms for or against any applicant for promotion, whether that supervisor customarily or regularly directs the applicant or not.  If upper management considers a recommendation or non-recommendation to be well founded, based for example on a Construction, CAS, SRT or Field Lieutenant's knowledge, experience and personal supervision of an applicant, that opinion will be given particular weight; although a higher level manager's recommendation may be given more importance.  The same is true for SRT Captains.  The Court finds that Construction, CAS, SRT, and Field Lieutenant's and SRT Captains's recommendations or non-recommendations are given particular weight.

The Court does not find, however, that opinions or recommendations of Fire Lieutenants,

Desk and Administrative lieutenants, and Curriculum Developers are given particular weight. These positions either follow a different practice or do not have the long-term personal supervision which causes management to give particular weight to their opinions regarding an individual applicant for promotion.

### *"Primary Duty" Requirement*

#### *Field Lieutenants*

More than 50% of a Field Lieutenant's time is spent supervising the SPO subordinates on their shift. Less than 10% of their time is spent in routine office work; in fact, they really do not have an office. The majority of their field time is spent free from direct supervision. Considering the relative importance of their exempt supervisory duties as compared with other types of duties, the Court finds that the principal, main, major or most important duty that these employees perform is supervision of their subordinates or tasks that are directly and closely related to their exempt duties and that contribute to or facilitate performance of exempt work.

#### *SRT Captains*

More than 50% of a SRT Captain's time is spent supervising the Lieutenants and SPO subordinates on their shift. The evidence is unclear as to the amount of their time spent in office work. However, considering the relative importance of their exempt supervisory duties as compared with other types of duties, the Court finds that the principal, main, major or most important duty that these employees perform is supervision of their subordinates or tasks that are directly and closely related to their exempt duties and that contribute to or facilitate performance of exempt work.

#### *Desk and Administrative Lieutenants*

The majority of Desk and Administrative Lieutenants' time is spent in routine office work.

The Defendant has not shown that the majority of their time is spent free from direct supervision. There is no credible evidence that Desk Lieutenants or Administrative Lieutenants customarily and regularly direct the work of two or more other employees. They do not have the authority to hire or fire other employees. Their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are not given particular weight. Considering the relative importance of their potentially exempt duties as compared with other types of duties, the Court does not find that the principal, main, major or most important duty that these employees perform is supervision of subordinates or administrative tasks that are directly and closely related to their exempt duties and that contribute to or facilitate performance of exempt work.

## Central Alarm Station Lieutenants

The majority of CAS Lieutenants' time is spent in an office environment directly supervising the technician subordinates on their shift. Considering the relative importance of their exempt supervisory duties as compared with other types of duties, the Court finds that the principal, main, major or most important duty that these employees perform is supervision of their subordinates or tasks that are directly and closely related to their exempt duties and that contribute to or facilitate performance of exempt work.

## Training Lieutenants

The majority of Training Lieutenants' time is spent performing exempt training supervision work. Training Lieutenants' job duties are comparable to that of a school teacher or coach – teaching from a book, showing how by example, giving and grading tests, keeping students safe on

field trips, and enforcing discipline if and where necessary./[5]  Considering the relative importance

of their supervisory duties as compared with other types of duties, the Court finds that the principal,

main, major or most important duty that these employees perform is supervision of their

subordinates or tasks that are directly and closely related to their exempt duties and that contribute

to or facilitate performance of exempt work.

### Curriculum Developers

The majority of Curriculum Developers' time is spent in office work, doing data entry type

work.  Defendant has not shown that the majority of their time is spent free from direct supervision.

Defendant has not shown that the majority of their time is spent performing exempt work.

Considering the relative importance of their allegedly exempt duties as compared with other types

of duties, the Court does not find that the principal, main, major or most important duty that these

employees perform is supervision of subordinates or administrative tasks that are directly and

closely related to their exempt duties and that contribute to or facilitate performance of exempt

work.

---

[5]        Defendant does not contend that Training Department employees are exempt because they are like teachers.  *See* 29 U.S.C. § 541.303(b)("Exempt teachers include, but are not limited to: Regular academic teachers; teachers of kindergarten or nursery school pupils; teachers of gifted or disabled children; teachers of skilled and semi-skilled trades and occupations; teachers engaged in automobile driving instruction; aircraft flight instructors; home economics teachers; and vocal or instrumental music instructors.  Those faculty members who are engaged as teachers but also spend a considerable amount of their time in extracurricular activities such as coaching athletic teams or acting as moderators or advisors in such areas as drama, speech, debate or journalism are engaged in teaching. Such activities are a recognized part of the schools' responsibility in contributing to the educational development of the student.").  There is no evidence that any Training Department employee possesses a teacher's certificate.  *See* § 451.303(c)("The possession of an elementary or secondary teacher's certificate provides a clear means of identifying the individuals contemplated as being within the scope of the exemption for teaching professionals.  Teachers who possess a teaching certificate qualify for the exemption regardless of the terminology (e.g., permanent, conditional, standard, provisional, temporary, emergency, or unlimited) used by the State to refer to different kinds of certificates.").

*Fire Lieutenants*

Defendant has not quantified with specificity how Fire Lieutenants spend the majority of their work time.  Defendant has not shown that the majority of their time is spent free from direct supervision.  As discussed at greater length *infra,* Defendant has not shown that the majority of their time is spent performing exempt work.  Considering the relative importance of their supervisory duties as compared with other types of duties and what Fire Lieutenants actually do on a daily basis, the Court does not find that the principal, main, major or most important duty that these employees perform is supervision of their subordinates or tasks that are directly and closely related to their exempt duties and that contribute to or facilitate performance of exempt work.

### Administrative Exemption

Defendant contends that the positions of Curriculum Developer and Administrative and Desk Lieutenants are exempt under the administrative exemption because employees in these positions routinely exercise discretion and independent judgment with respect to matters of significance. Defendant contends that Administrative and Desk Lieutenants' discretion extends to matters of scheduling workers for overtime, authorizing absences for personnel, calling personnel in for overtime work, and assigning shift personnel to work in critical and non-critical locations. Defendant contends that Curriculum Developers are exempt because they have discretion and exercise independent judgment when they update existing training manuals and provide initial drafts of proposed new training manuals.  Plaintiffs contend that they do not have such discretion and, in reality, do not exercise independent judgment with respect to matters of significance.

"The section 13(a)(1) exemptions are *not* available ... for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances." 29 C.F.R.

§ 541.704 (emphasis added). This regulation is significant to the positions of Curriculum Developer and Administrative and Desk Lieutenants under the facts of this case.

Pantex Curriculum Developers and Administrative and Desk Lieutenants' job duties call for them to apply well-established policies, techniques and procedures (as described in manuals and standing orders, or in specific limitations set by the Pantex Collective Bargaining Agreement, and/or in instructions from the Department of Energy and its various departments and divisions, and/or in B&W Pro-Force policy and procedural sources) within closely-prescribed limits to determine the correct response to an inquiry or set of circumstances. In their normal job duties they are given little discretion in matters of real significance. They follow mandatory instructions to adhere closely to well-established DOE and B&W Pantex policies, techniques and procedures. In short, they are not employed in a position where the exercise of discretion and independent judgment is more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources.

They do not have the authority to formulate, affect, interpret, or implement management policies or operating practices. That authority rests exclusively with the Shift Commander, the Chief, or even higher Pantex management, and the Department of Energy. They do not carry out major assignments in conducting the operations of the business.

The most important duty or the primary value to Pantex management of Administrative and Desk Lieutenants is that they make sure employees know who is working which shift, who is where at Pantex, and who is scheduled to leave early, arrive late, or is sick or off on vacation. While the scheduling of shift work potentially is work that may affect the business operations of Pantex to a substantial degree, they do not have – nor do they exercise – real discretion and independent judgment with respect to matters of such significance.

Administrative and Desk Lieutenants fill work shift positions deemed critical by their superiors, positions they have no discretion to determine or to not fill. They do not and can not call in employees who they consider to be "the best" workers, or the "best person for that job" – they must go by what name is at the top of the CBA list. If they can not contact the first person on the list, they have to go to the second name, then the third, and so on. They have no discretion or independent judgment in such matters.

They are not employees who have any authority to commit their employer in matters that have significant financial impact. The employment positions at issue in this suit have no authority to negotiate and bind the company on significant matters. They do not provide consultation services or expert subject matter advice to Pantex management. They are not involved in planning long- or short-term business objectives. They do not investigate and/or resolve matters of significance on behalf of management. They do not represent the company in handling complaints, arbitrating disputes or resolving grievances, even though they might, in rare instances, be a fact witness at such proceedings.

Administrative and Desk Lieutenants have no real authority to waive or deviate from established policies and procedures without approval – either in advance or on the spot – from the Shift Commander or the Chief. To the extent that Administrative and Desk Lieutenants and Curriculum Developers exercise any discretion and independent judgment, it is in areas such as clerical or secretarial work, typing, recording, printing or tabulating data using a computer or computer-generated lists of employees, or performing other mechanical, repetitive, recurrent or routine work. There is little to no risk of their employer experiencing financial losses if they as employees fail to perform these jobs properly, even though serious consequences may flow from the employee's neglect or because improper performance of the employee's duties may cause serious

financial loss to the employer.  Under the facts of this case, the positions of Curriculum Developer and Administrative and Desk Lieutenant are not entrusted to exercise discretion and independent judgment with respect to matters of significance – a necessary requirement for exemption.

### Highly-Paid Exemption

Defendant asserts that ten Plaintiffs were exempt employees because they earned more than $100,000.00 per year during one or more years of employment at Pantex. It is stipulated that all ten Plaintiffs earned a minimum of $100,000 in one or more specified years, all of which are within the limitations period at issue in this case./[6]

In an effort to avoid the legal effect of that stipulation, Plaintiffs assert that one or more of the ten did not actually make $100,000 *within one calendar year*.  They therefore argue these Plaintiffs are not exempt.  The Court refused Plaintiffs' attempt to withdraw from their binding stipulation that all ten made $100,000 or more in one year.  In any event, Plaintiffs' argument is incorrect.  The parties utilized a calendar year for calculation of the $100,000.00 "highly paid" exemption, but it need not be a calendar year if the employer specifies another 52-week period in advance:

(4) The employer may utilize any 52-week period as the year, such as a calendar year, a fiscal year, or an anniversary of hire year.  If the employer does not identify

---

[6]      "(b)(1) 'Total annual compensation' must include at least $455 per week paid on a salary or fee basis.  Total annual compensation may also include commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period.  Total annual compensation does not include board, lodging and other facilities as defined in § 541.606, and does not include payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other fringe benefits."  29 C.F.R. § 541.601 (b)(1).  Two of the ten (Donna Davis and Herbert Carr) were on track to earn more than $100,000 in 2008 only.  However, an "employee who does not work a full year for the employer, either because the employee is newly hired after the beginning of the year or ends the employment before the end of the year, may qualify for exemption under this section if the employee receives a pro rata portion of the minimum amount established in paragraph (a) of this section, based upon the number of weeks that the employee will be or has been employed."  *Id.* at (b)(3).

some other year period in advance, the calendar year will apply.

29 U.S.C. § 541.601(b)(4).  There is no dispute that Pantex identified its 52-week period in advance.

*Curriculum Developers, Desk Lieutenants or Administrative Lieutenants*

The Court does not find that Curriculum Developers, Desk Lieutenants or Administrative Lieutenants actually exercised a primary duty of management of the enterprise in which these employees are employed (i.e., Pantex), or a customarily recognized department or subdivision thereof, as the term "management" is properly construed under § 541.100 and under the facts of this case.  Desk Lieutenants or Administrative Lieutenants do not customarily and regularly "direct" the work of two or more other employees, as that term is properly construed under § 541.100 and under the facts of this case.  They do not have the authority to hire or fire other employees.  Their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are not given particular weight.  The Court therefore finds that employees in these two positions are not exempt even if they earned total annual compensation in excess of $100,000.00 in any year.

*Fire Department Lieutenants*

That "[t]he intent to extend the exemption to ambulance and rescue service employees is not reflected either in the statute itself or in congressional reports related to the statute" has been held as an additional reason for construing "the extension [to EMS personnel] as written into the regulations ... very narrowly."  *O'Neal v. Barrow County Bd. of Comm'rs*, 980 F.2d 674, 677 (11th Cir. 1993).

Fire Lieutenants are first responders who take charge of the scene upon first arrival and control the activities of their subordinates until a higher ranking office arrives at the scene, if any.

However, when a fire ignites the Lieutenants are expected *and required* to enter into the burning building with their crew, entering third in line with their hands upon the "charged hose" (i.e, a fire hose with pressurized liquid in it which is directly used to fight fires), and to directly engage the fire and suppress it.  Under the specific facts of this case, those Lieutenants are not exempt personnel but are first line firefighters.

Likewise, Fire Lieutenants are first responders who take charge of auto accident scenes upon first arrival and control the activities of their subordinates until a higher ranking office arrives at the scene, if any.  There is no evidence that in such situations, where the Fire Lieutenants or even Fire Captains are EMT/Paramedic-certified, the policy or actual practice is for higher-ranking Pantex Fire Department managers to be dispatched to or go to the accident scene to assume command when the EMT/Paramedic-certified Fire Lieutenants or Captains transfers command to a subordinate.

When responding to that auto accident the EMT/Paramedic-certified Lieutenants are expected *and required* to turn over control of the scene to a subordinate and to enter into the automobile with their crew, with hands upon the accident victims, and to engage in search and rescue operations and medical care.  Under the specific facts of this case, in those situations those Lieutenants are not exempt personnel but are first line EMT or Paramedics.

These are not isolated occurrences or rare emergency situations.  Pantex fire department EMTs and Paramedics have responded to hundreds of auto accidents over the relevant time period.

At the times relevant to this lawsuit the Pantex Fire Department did not have enough EMT and Paramedic personnel per shift to make its supervisory personnel truly supervisors when regularly recurring tasks – such as being the first responders to auto accidents – required such certified supervisors to carry out non-exempt functions and responsibilities.  While some non-exempt work could have been performed by the exempt employees' subordinates, the practicability

of delegating EMT and Paramedic work to a non-exempt employee was non-existent because often there was no certified EMT or Paramedic to perform that work on some shifts.  Again, these non-exempt tasks were frequently and not occasionally performed pursuant to Pantex Fire Safety Department policies and procedures and Pantex's mutual aid agreement with local governmental entities.  The lack of sufficient EMT and Paramedic personnel does not entitle Defendant to wrongfully classify any non-exempt employee as FLSA exempt.

*Collective Bargaining Agreement (CBA)*

Defendant argued at trial that some of the Desk and Administrative Lieutenants' duties are mandatory pursuant to the Pantex collective bargaining agreement.  However, collective bargaining agreements cannot waive or reduce the Fair Labor Standards Act's protections.  29 C.F.R. § 541.4. The Court does not find that these two supervisory positions had or exercised real discretion as a part of their job duties.

# Damages

### Willfulness

After employee complaints about overtime violations of the FLSA were raised in a 2005 Pantex Pulse article, management sought the advice of outside counsel.  Defendant offers as evidence of its lack of willfulness the following: 1) no one had ever complained to Protective Force supervisors *specifically* about FLSA mis-classifications of exempt positions in the context of a wrongful refusal to pay overtime in violation of federal law, 2) earlier "consultations" with the Dept. of Labor 3) legal advice received from attorney Brad Chapman, who later became in-house counsel, and 4) four DOL opinion letters.

*Specificity of Employee Overtime Complaints*

Regardless of whether Pantex management had notice of specific questionable pay practices, the publication of the 2005 <u>Pantex Pulse</u> article put the Defendant on reasonable notice that, at a minimum, it ought to look very carefully at the issues of FLSA positions as exempt and its possible failure to pay overtime in violation of federal law.  Pantex management knew about lack of overtime pay complaints on the part of employees, but really did not want to hear about it.  The attitude effectively communicated to complaining subordinates was "if you don't like it, find another job."  The generally understood warning was if you complained about it too much, you'd "find yourself throwing rocks" at the main Pantex gate – from the outside.  Management's verbal advice to persons who complained was that they should  "look in the mirror" and ask yourself if you really wanted your job.  If you did, you would not talk about such subjects at work, or away from work.

<em>Consultations with the Department of Labor</em>

Defendant contends that sometime during 1995-96 (and perhaps again during 2004 to 2006) someone, representing the Defendant in some capacity, had conversations with some unknown representatives of the Department of Labor, perhaps even with someone in the Wage and Hour Division of the Department of Labor, about whether it was obligated to pay overtime to its protective force officers, and perhaps its fire protection personnel.  Thus, it is clear that the Defendant had noticed its FLSA overtime obligations before 2004.

Nevertheless, the Defendant has failed to show what it was told, by whom, and that it relied on advice from the Department of Labor or its Wage and Hour Division.   Defendant cannot claim reliance immunity under the Portal-to-Portal Act on the grounds that it was an employer who innocently and to his detriment followed the law as it was laid down to him by government agencies. *Cf. Roy v. County of Lexington, South Carolina*, 141 F.3d 533, 543 (4th Cir. 1998); *Hodgson v. Square D Co.*, 459 F.2d 805, 809 (6th Cir. 1972)(reliance on the statements of anyone other than the

-34-

Administrator of the Wage and Hour Division of the Department of Labor, such as a regional director, do not satisfy the § 259 "agency" immunity requirements).

*Chapman's Opinion Letter and the Pantex Self Audit*

Defendant relies in part on a letter from attorney Brad Chapman.  While "reliance on opinion letters from counsel can show a good faith effort to comply with the [FLSA]," *Kinney v. District of Columbia*, 994 F.2d 6, 12 (D.C. Cir. 1993), Chapman's opinion letter did *not* say that all of the relevant Protective Force Lieutenants and Fire Safety/EMT/Paramedic Lieutenants and Captains were exempt personnel.  His review of Pantex's self-selected job position survey did not inquire about all of the relevant job categories at issue in this case.  He looked only at the job duties and positions the Defendant chose to provide to him.

Chapman conducted no follow up interviews of any protective force personnel.[7]  He conducted no on-site observations.  He had no personal knowledge at the time of any of the job duties of Pro-Force supervisors.  He had no personal knowledge at the time of how the DOL Wage and Hour Division does a field audit or a wage and hour field investigation.  At the time of his audit he did not know the details of the fire and auto wreck mutual aid agreement between Pantex and local governmental entities.  He did not know those details at the time of trial.  The Pantex audit was the only such audit he had ever done at the time, and at the time of trial he had never done another like it.

The Court does not find that the number of job positions surveyed was statistically significant, or sufficient to ensure a reliable survey.  In short, the factual underpinnings and

---

[7]     Even though most of his job questionnaires came back unsigned, in violation of Pantex policy and procedures that all paperwork is to be personally signed by the author.

-35-

methodology of the self-audit leads the Court to find that the self-audit does not support a finding of a good faith effort to comply with the FLSA.

Chapman's actual conclusions in his opinion letter cautioned that the Pantex corporate culture equated "being exempt personnel" with "receiving larger, more frequent pay raises," and that this cultural viewpoint has a real tendency to skew answers and the outcome of investigation of who is and is not exempt under the FLSA.  Chapman expressly cautioned the Defendant that actual job duties must be looked at closely, and warned that more factual study was warranted in certain specific employment areas.

Defendant did not seek a DOL Wage and Hour Division field audit of their claimed exemptions.  The DOL opinion letters, Chapman's opinion letter, and the audit are not plain and substantial evidence of actions undertaken in good faith, or that the Defendant had reasonable grounds for believing that its acts or omission were not in violation of the FLSA overtime requirements.  No Wage and Hour Division field investigators were involved in either of the FLSA exemption reviews done at Pantex, either in 1995-96 or later.  Despite the fact that there are well over 3,000 employees at Pantex and nearly 700 Pro-Force employees, no agency opinion letter was sought regarding FLSA exemptions, and none was sought as to whether the written job duty descriptions were accurate or the jobs were properly classified as exempt.  *See* 29 C.F.R. § 541.2 ("A job title alone is insufficient to establish the exempt status of an employee.").  As far as the Court can determine, there are no opinion letters directly on point in the unique, rule-bound environment of a nuclear weapons assembly and disassembly point such as Pantex.  Certainly, the parties have not cited such authority. The Court finds that instead of seeking DOL field investigators' advice on whether overtime compensation is required for fire department first responders, Administrative and Desk Lieutenants, Curriculum Developers and other relevant

positions under the specific facts at Pantex, Defendant made its compensation decisions by asking a self-selected small sample of employees, which it alleged but did not show were randomly selected, whether their job duties in effect mirrored their written job descriptions.

Defendant's limited audit inquiry, outside attorney's opinion letter, and actual awareness of Dept. of Labor opinion letters – as further discussed at length below – are insufficient to support a finding of good faith. *See Reich v. Southern New England Telecommunications Corp*., 121 F.3d 58, 71-72 (2nd Cir. 1997).

### *FLSA Opinion Letters*

The final evidence offered of Defendant's good faith are four opinion letters issued to other employers by the Dept. of Labor which relate to overtime policies for Protective/Security Force and Fire Safety personnel.  Significantly, however, three of the four opinion letters state only that under certain circumstances using deductions from an exempt employee's accumulated sick leave and/or vacation time bank in order to issue paychecks for 40 hours in a work week is permitted where a salaried employee actually worked less than 40 hours in a week.  None of the Plaintiffs was paid for less than 40 hours a week during the relevant time period.  Those opinion letters do not state that the employment positions at issue in this lawsuit are overtime exempt.

### *First Opinion Letter*

Defendant's reliance on the DOL Opinion Letter dated January 7, 2005, FLSA2005-7 , is misplaced because that opinion letter was concerning whether an employer may deduct from an exempt employee's Paid Time Off Bank (PTO) for absences of less than a day due to personal reasons, accident, or illness, as well as whether it is acceptable for the employer to reduce an employee's salary for absences of one or more *full* days due to illness or injury when the employee's

PTO bank has been exhausted.  Full day absences are not an issue in this case.

*Second Opinion Letter*

Defendant's reliance on the DOL Opinion Letter dated October 28, 2005, FLSA2005-46 , is likewise misplaced because that opinion letter concerned the "salary basis" requirements for exemption under section 13(a)(1) of the Fair Labor Standards Act (FLSA) and its implementing regulations, 29 C.F.R. Part 541, where healthcare institutions have specialized "no absence" policies due to their special needs even in weather emergencies.  Further, that opinion letter addressed "full-day absences only," and the Administrator cautioned the employer that "if an exempt employee is absent for one and a half days ... the employer can deduct only for the one full-day absence." *Id.* (citing 29 C.F.R. § 541.602(b)(1)).  Further, "deductions from salary for less than a full-day's absence are not permitted" under the FLSA regulations. *Id.* It did not address whether job positions similar to Plaintiffs were properly classified as exempt, or not.

*Third Opinion Letter*

Defendant relies on DOL Opinion Letter dated July 9, 2003, FLSA2003-5, which is an opinion letter concerning whether a particular compensation system complies with the "salary basis" test required for exemption as an executive, administrative or professional employee under the Fair Labor Standards Act (FLSA) pursuant to 29 C.F.R. § 541.118.  However, in that letter the Administrator states:

> In requesting my opinion, you asked that I assume that the "duties" test requirements of the exemption provisions are satisfied.  You also asked that I assume that, under the compensation system, reductions in pay may occur as the result of time-entry errors or omissions and not as the result of a variation in the quantity or quality of work performed by an employee, e.g., due to partial day absences, a shortage of cash, a shortage of work, jury/military duty, discipline, etc.

> Before generalizing on this compensation plan overall, *we caution that, because of*
> *the structure and wording of the exemption tests, they must be applied*
> *employee-by-employee. Determining the exempt status of any particular employee*
> *requires considering the specific conditions of the actual employment experience of*
> *each individual employee who must be evaluated under all the applicable tests.*

Opinion Letter, 2003 WL 23374601 (dated July 9, 2003)(emphasis added).

Defendant did not comply with the Administrator's express instruction to apply the exemption tests "employee-by-employee," or consider "the specific conditions of the actual employment experience of each individual employee who must be evaluated under all the applicable tests." The self audit covered only management-selected jobs, and a limited selection at that.

### Fourth Opinion Letter

Defendant relies on DOL Opinion Letter, dated October 14, 2005, FLSA2005-40, which concerns the application of 29 C.F.R. Part 541 to high ranking police officers and fire fighters employed by a city government. The issue in that letter was whether a city's Police Lieutenants, Police Captains, and Fire Battalion Chiefs are exempt from the minimum wage and overtime provisions of the FLSA. This letter is relevant, but in it the Administrator stated:

> "[the] §13(a)(1) exemptions do *not* apply to police officers, fire fighters or other first
> responder employees who perform work such as extinguishing fires, rescuing crime
> or accident victims, performing surveillance, pursuing or restraining suspects,
> interviewing witnesses, and other similar work identified in the regulations because
> their primary duty is not management or directly related to the management or
> general business operations of the employer. Thus, such employees do *not* qualify
> for an exemption as an executive or administrative employee under § 541.100 or §
> 541.200. These positions also do *not* meet the test for an employee in a professional
> capacity because there is no requirement of knowledge of an advanced type in a field
> of science or learning customarily acquired by a prolonged course of specialized
> intellectual instruction. 29 C.F.R. §§ 541.3(b)(1)-(4)."

Opinion Letter, 2005 WL 3308611 (dated October 14, 2005)(emphasis added). The job positions

at issue in this case do not include Fire Chiefs or any city police officers at any rank./[8]

The supervisory positions at issue in this case do not regularly include the duties of performing surveillance, pursuing or restraining suspects, interviewing witnesses to crimes, or other similar law enforcement work. The fire supervisor position does, however, involve the work duties of extinguishing fires and rescuing accident victims. In that regard, the opinion letter clearly and expressly states that the Fire Lieutenant position is *not* exempt under Part 541 because those duties are "not management or directly related to the management or general business operations of the employer."

All four of the opinion letters gave notice to the Defendant that it ought to investigate whether it was in compliance with FLSA regulations. They should have made the Defendant *suspect*, at the least, that Pantex Fire Lieutenants are *not* exempt and then address that issue in more than its limited self audits.

The fourth 2005 opinion letter next states that:

Meeting the requirements of § 541.100(a)(2) depends on the employees' "primary duty" in their management position. Primary duty is defined in § 541.700(a) as "principal, main, major, or most important duty that the employee performs." Factors to consider in determining an employee's primary duty include "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. §541.700(a). It is important to remember that the primary duty determination is based on all of the facts and circumstances in each individual case with major emphasis on the character of the employee's job as a whole. Further,

---

[8]       City police and firefighters are regulated under different CFRs – Part 553, not 541. "The application of sections 13(b)(20) and 7(k), by their terms, is limited to public agencies, and does not apply to any private organization engaged in furnishing fire protection or law enforcement services." 29 C.F.R. § 553.202. "This is so even if the services are provided under contract with a public agency." *Id.*

although the amount of time spent on exempt work can act as a guide, time is not conclusive.  However, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. 29 C.F.R. §541.700(b).

The evidence in this case does not establish the relationship between the employee's salary and wages paid to other employees for the kind of nonexempt work performed by the employees, or all employees' relative freedom from direct supervision.  On those factual questions the burden was on the Defendant.  The balance of the listed factors have already been addressed, *infra*.  The opinion letter next states:

> In determining whether an employee's suggestions and recommendations are given "particular weight," factors such as whether it is part of the employee's job to make such recommendations, the frequency with which such recommendations are made or requested, the frequency with which the recommendations are relied upon, among others, are relevant.  However, the regulations do not require the employee to have authority to make the ultimate decision and a higher level manager's recommendation may be given more importance.  29 C.F.R. §541.105.

This issue has already been addressed by the Court.

Regarding the Fire Lieutenant's position, 29 C.F.R. § 541.706 (effective April 23, 2004), regarding "emergencies" is also relevant:

> "(a) An exempt employee will not lose the exemption by performing work of a normally nonexempt nature because of the existence of an emergency.  Thus, when emergencies arise that threaten the safety of employees, a cessation of operations or serious damage to the employer's property, any work performed in an effort to prevent such results is considered exempt work.
>
> (b)  An "emergency" does not include occurrences that are not beyond control or for which the employer can reasonably provide in the normal course of business. Emergencies generally occur only rarely, and are events that the employer cannot reasonably anticipate."

Building fires at Pantex are events which the employer can reasonably anticipate, and which Pantex does anticipate.  The Pantex fire department prepares for fires by routinely participating in

fire prevention and suppression activities.  Pantex Fire Lieutenants' regular duties include fire extinguisher checks on a consistent basis, where the Lieutenant usually carries a clipboard list of extinguishers to check, marking off those extinguishers as they are checked.  This is hardly the type of job duties that is exempt pursuant to any of the section 13(a)(1) exemptions and the regulations, which "do not apply to manual laborers or other 'blue collar' workers who perform work involving repetitive operations with their hands, physical skill and energy."  29 C.F.R. § 541.3(a).  "Such nonexempt 'blue collar'" work is regularly and frequently done by Pantex Fire Lieutenants who "gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction."  *Id.*

There is no evidence in this case of an "emergency" like an explosion or a building fire with people trapped inside.  There is no evidence of periods of heavy workloads or rush orders requiring Pro-Force or Fire Lieutenants to step in and do emergency non-exempt work.  There is no evidence of any exempt supervisor stepping into a non-exempt SPO position because of the sudden illness of a SPO or fire department worker.  The evidence in this case is that Pantex management either calls in off-duty SPOs to replace the ill employee, or shifts a SPO from a non-critical location to replace the ill employee.  No evidence was offered on this subject for fire fighters.

There is evidence of the regular cleaning of fire fighting equipment by Fire Lieutenants, but the regulations expressly state that this is *not* exempt work.  There is no evidence of equipment repairs or breakdowns or damage caused by accident or carelessness that Pantex management could not reasonably anticipate.  Based upon this record the Pantex Fire Lieutenant's position is not a

FLSA overtime-exempt position./[9]

Pantex Fire Department personnel routinely work around hazardous materials.  It is a regular part of their job to maintain lists of where such materials are stored and to check the accuracy of those lists.  The undisputed testimony at trial was that Pantex Fire Lieutenants, and even Fire Captains under certain situations, who are EMT or paramedic certified, at any level, routinely perform work such as preventing, controlling or extinguishing fires and rescuing fire or accident victims.  That is their primary duty – to fight fires and rescue accident victims – a "hands on" duty that has the most value and importance to the operations of Pantex and to Pantex management; therefore, Pantex Fire Lieutenants are not overtime exempt.

The Court does not find that the Defendant acted in good faith in classifying Fire Lieutenant as an exempt position.  The Court likewise finds that Defendant did not act in good faith by classifying Curriculum Developer, Desk Lieutenant, and Administrative Lieutenant as exempt positions.  These were willful mis-classification decisions.

*Application of § 541.3 to Pantex Field, Construction and SRT Supervisors*

The primary duty of Field and SRT supervisors is performing work such as preventing, controlling, detecting and deterring intrusions into controlled-access areas and into Pantex generally; conducting inspections for SPOs' and others' violations of Pantex anti-intrusion or intrusion deterrence policies and procedures; performing surveillance of their SPO and SRT subordinates;

---

[9]      This conclusion is in accordance with 29 C.F.R. § 541.3(b), a Department of Labor FLSA regulation effective April 23, 2004, for fire fighters, paramedics, EMT, rescue workers and workers who work with hazardous materials (which abound at Pantex), which expressly states that "the section 13(a)(1) exemptions and the regulations in this part [Part 541] also do *not* apply to police officers, ... fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, ... or accident victims; ... performing surveillance; pursuing, restraining and apprehending suspects; ...  or other similar work."

personally pursuing, restraining and apprehending intruders and/or suspected terrorists, if and when necessary; detaining or supervising detention of suspected terrorists and/or other detained intruders; interviewing their subordinates and witnesses regarding policy violations, and preparing initial investigative reports; and other similar security work.  While this initially appears to substantially mirror the § 541.3(b)(1) list of non-exempt duties, the majority of the Field Lieutenants' time – well over 50% – is spent directly supervising their subordinates in field post checks.  That they frequently perform repetitive operations with their hands (by driving from post to post, pick up weapons, etc.) and climb observation towers (which requires the expenditure of physical skill and energy), does not turn their jobs into non-exempt positions.

Likewise, the primary duty of Pantex Construction Lieutenants is to perform work such as preventing, controlling, detecting and deterring intrusions into controlled-access areas inside Pantex; supervising the conducting of inspections for construction crews' and others' violations of Pantex controlled-area policies and procedures; performing supervision over their SPO subordinates; reviewing Pantex policies and procedures with their subordinates, as needed, and giving on-the-spot corrections regarding policy violations, and similar work.

The majority of the Construction Lieutenants' time is spent directly supervising their subordinates.  It is the same for SRT Captains.  Under the facts of this case, these are exempt supervisory positions.

### *Partial Pay Docking*

The parties stipulated that "[f]or all relevant time periods, all Plaintiffs were paid a bi-weekly salary that was not subject to deductions based upon the quantity or quality of the Plaintiff's work." Joint Pretrial Order Stipulation of Fact #6.  Contrary to that clear stipulation, Plaintiffs sought to argue that the Defendant lost the benefit of FLSA overtime exemption because their salary was

subject to deductions by allegedly improper partial-day deductions.  The Court denied Plaintiffs'
motion, made during trial, to be excused from the effect of that stipulation.  The Court discusses the
partial pay docking issue only to explain why Plaintiffs' contentions in that respect are without
merit.

Since 2004 it has been the policy of the Pantex Protective Force to pay its Lieutenants and
Captains a 40 hour per week salary based upon a three day work week, calculated as paying for 13½
hours for the first day, 13½ hours the second day, and 13 hours the third day.  However, since at
least 2006 the Defendant has also engaged in a regular practice of actually making partial-day
reductions from salaries earned due to variations in the quantity of work performed.

Plaintiffs argue that Pantex payroll records show partial-day deductions (from 2 to 4 hours)
in "salaried pay" for days in which a Plaintiff did not actually work 13 or 13½ hours.  In other
words, if a Plaintiff was given permission by the Shift Commander, or his designee, to go home
early then that employee was not actually paid a 13 or 13½ hour based salary for that day.  In order
for that Plaintiff to be paid his or her 40-hour salary, Defendant's payroll department had a policy
of charging these less-than-full-day deductions against an employees' accumulated vacation or sick
leave bank, if they had time in those banks.  If they had no time in the bank, which apparently did
not occur,[10] the policy called for that employee to be paid a reduced 70% short-term disability salary
for the hours short of 40 in a workweek.

This policy was not an "isolated deduction," corrected by the Defendant when brought to its
attention.  It was an employment policy that made an actual practice of making such less-than-full-
day deductions.  It is a clear and particularized policy which effectively communicated that partial
day deductions will be made in those specific circumstances.

---

[10]     The evidence at trial was that it had never occurred.

However, "[a]n exempt employee's earnings may be computed on an hourly ... basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned."  29 C.F.R. § 541.604(b).  "The reasonable relationship test will be met if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek."  *Id.*  That is the case here.  Pantex exempt employees are paid at least the minimum weekly required amount on a salary basis regardless of the time they actually work.

Further, the relevant DOL regulations distinguish compensation or "salary" regularly received each pay period from compensation for accrued benefits such as paid leave.  The Department of Labor has stated that while the employer may not deduct salary for partial day absences under 29 C.F.R. § 541.118(a)(2) and (3), the employer *may* require an employee to substitute paid leave for partial day absences without losing the exemption.  Administrative Letter Ruling1987-__, Department of Labor, Wage and Hour Division, dated July 17, 1987.  This interpretation has been ruled controlling because it is not plainly erroneous or inconsistent with the regulation.  *Karson v. American College Of Cardiology*, 198 F.3d 237 (4th Cir. 1999)(*per curium*)(citing  *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)).  Pantex's policy regarding charging an exempt employees' accumulated vacation or sick leave bank to substitute paid leave for partial day absences, under the specific facts of this case, does not result in Pantex losing exemptions.

### *Conclusions*

-46-

Curriculum Developer, Desk Lieutenant, Administrative Lieutenant and Fire Safety Lieutenant are not exempt positions. Defendant acted willfully and did not act in good faith regarding its wrongful classification of these as exempt positions. Plaintiffs in these non-exempt job positions are entitled to three years unpaid overtime compensation and an additional equal amount as liquidated damages.

Field Lieutenants, Construction Lieutenants, Central Alarm Station Lieutenants, Training Lieutenants and Captains and Special Response Team Captains are in exempt positions.

The parties have stipulated the position and time in that position that each Plaintiff worked, the amounts that they were paid, and how pay was calculated.

The parties are ordered to confer and prepare a judgment consistent with this opinion as to each Plaintiff on or before July 11, 2009. If the parties can not reach such an agreement, they are to each tender a proposed judgment by that date.

It is SO ORDERED.

Signed this the 17th day of June, 2009.


/s/ Mary Lou Robinson
**Mary Lou Robinson**
United States District Judge